IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| TODD ROWAN, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) CIVIL ACTION NO: |
| DUBBER, INC., | ) 1:19-CV-01276-SDG ) |
| Defendant. | ) ) ) |

## **DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Rule 56.1(B) of the Local Rules for the United States District Court for the Northern District of Georgia, Defendant Dubber, Inc. ("Defendant" or "Dubber") files this Statement of Undisputed Material Facts and shows that the following facts are undisputed as established by the deposition and declaration filed with the Court in support of Defendant's Motion for Summary Judgment.

1. Dubber is a technology company that provides a scalable call recording service, which has been adopted as a core network infrastructure by multiple global telecommunications carriers in North America, Europe, and Asia. [Declaration of James Slaney "Slaney Dec." at ¶4].

2. Dubber was founded in Melbourne, Australia in 2011. [Slaney Dec.

¶5].

3.      In 2017, Dubber began implementing a strategy to expand into the United States. [Slaney Dec. ¶6].

4.      To achieve this goal, Dubber engaged with a U.S.-based search firm to identify potential candidates in the U.S. to work for Dubber and assist in bringing Dubber's products into the U.S. market. [Slaney Dec. ¶7].

5.      In March 2017, Plaintiff was contacted by a recruiter named John Butler, who worked for a company called SearchLogix. [Deposition of Plaintiff Todd Rowan "Pl.'s Dep." 39:3-17].

6.      Butler explained to Plaintiff that Dubber was expanding into the U.S. and was looking to hire a sales executive to develop its U.S. operations. [Pl.'s Dep. 39:21-40:8; Slaney Dec. ¶¶7-8].

7.      After the door of potential employment was opened by initial discussions with Butler, James Slaney – Dubber's President and Co-Founder – thereafter began communicating directly with Plaintiff about his potential employment. [Pl.'s Dep. 50:3-14; Slaney Dec. ¶9].

8.      Plaintiff and Slaney emailed back and forth about various issues related to the role and compensation, before Slaney ultimately presented Plaintiff with an offer of employment. [Pl.'s Dep. 68:9-73:7; Ex. 3].

9. Plaintiff's Offer Letter provides for various terms regarding Plaintiff's employment with Dubber, [Pl.'s Dep. Ex. 4], including: job duties [Pl.'s Dep. 75:9-23]; supervision by James Slaney [Pl.'s Dep. 75:24-76:9]; and Plaintiff's initial compensation [Pl.'s Dep. 76:10-77:3].

10. Specifically, the Offer Letter provides that Dubber will pay Plaintiff $180,000.00 per year with estimated OTE (on target earnings) of approximately $300,000.00. [Pl.'s Dep. Ex. 4].

11. On commissions, the Offer Letter states commissions will be "based on the increase of recurring revenue within the region, with accelerators for new Service Provider Agreements." [Pl.'s Dep. 77:9-12].

12. The Offer Letter does not contain any formula, percentage, or other quantifiable mode of calculation regarding commissions. [Pl.'s Dep. 79:7-16; Ex. 4].

13. Plaintiff accepted the offer, and began working for Dubber in April 2017. [Slaney Dec. ¶10].

14. Apart from the Offer Letter, Plaintiff never signed any other contract or agreement with Dubber pertaining to the terms, conditions, or compensation of his employment with Dubber. [Slaney Dec. ¶11].

15. Further, Dubber never offered Plaintiff any employment agreement or

contract. [Slaney Dec. ¶12].

16. Plaintiff was an employee-at-will at all times. [Slaney Dec. ¶13].

17. Plaintiff admits he worked from an office in Georgia, signed the Offer Letter in Georgia, and otherwise performed the duties of his role with Dubber in Georgia. [Pl.'s Dep. 127:6-128:2].

18. During his employment, Plaintiff did receive certain commissions. [Pl.'s Dep. 80:6-81:17].

19. Specifically, and pursuant to Dubber's commission plan, Dubber paid Plaintiff commissions based on a formula tied to three distinct categories: (1) deal announcements; (2) committed revenue; and (3) addressable market. [Pl.'s Dep. Ex. 6].

20. The amount Plaintiff earned depended on whether, for a certain deal, Plaintiff was acting as an Account Manager or Sales Manager. [Slaney Dec. ¶14].

21. Plaintiff primarily performed the role of Account Manager, but sometimes also served as Sales Manager on various deals. [Slaney Dec. ¶15; Pl.'s Dep. 86:21-87:15].

22. As an Account Manager, Plaintiff earned the following:

- For a deal announcement, Dubber paid Plaintiff $3,750.00 per deal announced to Dubber's investment market. *Id*.
- For committed revenue, Dubber paid Plaintiff $375.00 per every $1,250.00

      USD in committed monthly revenue (per deal) on the date of signing. *Id*.
- For addressable market, Dubber paid Plaintiff $250.00 per every 30,000 users in the addressable market that were connected to the call control platform which Dubber has the ability to record. *Id*.

[Pl.'s Dep. Ex. 6; Slaney Dec. ¶16].

23. These numbers are calculated by multiplying a base number of $2,500.00 by various co-efficient multipliers provided in the commission plan. [Pl.'s Dep. Ex. 6].

24. As a Sales Manager, Plaintiff earned the following:

- For a deal announcement, Dubber paid Plaintiff $1,125.00 per deal announced to Dubber's investment market. *Id*.
- For committed revenue, Dubber paid Plaintiff $1,125.00 per every $1,250.00 USD in committed monthly revenue (per deal) on the date of signing. *Id*.
- For addressable market, Dubber paid Plaintiff $75.00 per every 30,000 users in the addressable market that were connected to the call control platform which Dubber has the ability to record. *Id*.

[Pl.'s Dep. Ex. 6; Slaney Dec. ¶17].

25. These numbers are calculated by multiplying a base number of $750.00 by various co-efficient multipliers provided in the commission plan. [Pl.'s Dep. Ex. 6].

26. Each category has additional terms and conditions that are provided in the Commission Plan. [Pl.'s Dep. Ex. 6].

27. Monthly, Dubber produced a commission report that laid out exactly what Plaintiff would earn in commissions, pursuant to the commission plan

discussed above. [Pl.'s Dep. 85: 9-86:15; Slaney Dec. ¶18].

28. Plaintiff admits that all commissions paid to him were represented on these spreadsheets. [Pl.'s Dep. 88:1-4].

29. It is undisputed that Plaintiff was never paid any other category or type of commissions. [Pl.'s Dep. 81:18-24; 88:1-4].

30. Plaintiff never signed any other agreement or contract with Dubber relating to commissions. [Pl.'s Dep. 88:5-15].

31. In October 2018, Dubber determined that Plaintiff was not meeting the Company's expectations, as he failed to bring about the success that Dubber expected to achieve in the U.S. market. [Slaney Dec. ¶19].

32. As a result, Dubber terminated Plaintiff's employment on October 26, 2018. [Slaney Dec. ¶20; Pl.'s Dep. 142:17-143:5].

33. On November 10, 2018, following his termination, Plaintiff emailed Dubber leadership to address "monies [Plaintiff was] owed following the abrupt and unprofessional termination" of his employment. [Pl.'s Dep. Ex. 11].

34. In this email, Plaintiff claimed he was owed three categories of compensation:

> Commissions: Plaintiff alleged he was not paid his September 2018 commissions, totaling "$25,956.66." Plaintiff further alleged an underpayment of commissions in June 2018. Plaintiff last alleges that he was promised a 25% bonus commission on "the monthly increase

        in revenue produced in [his] region." In total, Plaintiff claimed he was owed approximately $115,206.00 in unpaid commissions.
        <u>Severance</u>: Plaintiff alleged that his "offer letter contains severance pay provisions" and that he was owed one year's salary as severance, or $180,000.00.
        <u>ESOP Shares</u>: Plaintiff alleged that his offer letter mentioned participation in Dubber's ESOP program, but that this "ESOP was never implemented." He estimated these shares would be valued at $32,000.00, if they existed.

[Pl.'s Dep. Ex. 11].

35. Approximately a week later, Dubber reached out to Plaintiff to arrange a meeting between Slaney and Plaintiff. [Pl.'s Dep. 159:8-13; Ex. 12; Slaney Dec. ¶21].

36. Dubber requested that Plaintiff "advise a suitable time" for a meeting with Slaney to discuss final payment of commissions, as well as the other matters. [Pl.'s Dep. 159:8-13; Ex. 12; Slaney Dec. ¶22].

37. Importantly, Dubber agreed that Plaintiff was owed his final commission check – in an amount Calculated by Dubber as $28,907.39. [Slaney Dec. ¶23].

38. Dubber remained baffled as to Plaintiff's contrived claims for additional commissions, in the form of a 25% "bonus", severance pay, and ESOP shares. [Slaney Dec. ¶24].

39. Nonetheless, Dubber reached out to Plaintiff to arrange a meeting

with the express intention to pay him the limited outstanding commissions. [Slaney Dec. ¶25].

40. Unfortunately, Plaintiff outright refused to meet with Slaney. [Pl.'s Dep. 158:18-159:7; Slaney Dec. ¶26].

41. Instead, Plaintiff demanded that Dubber respond to the "other outstanding items" or Plaintiff would "move forward to the next steps." [Pl.'s Dep. 158:18-159:7].

42. In his Complaint, Plaintiff claims entitlement to the same three enumerated categories of compensation from his November 2018 email. [Doc. 01-1; Pl.'s Dep. Ex. 11].

43. Plaintiff is unable to show that he entered into any employment agreement or contract with Dubber. [Slaney Dec. ¶¶11-12].

44. There is no dispute that Plaintiff was – at all times – **an employee at will**. [Slaney Dec. ¶13].

45. The Offer Letter does contain limited, enforceable obligations. [Pl.'s Dep. Ex. 4].

46. For example, the Offer Letter promises an annual salary of $180,000.00 per year. [Pl.'s Dep. Ex. 4].

47. The Offer Letter **does in fact contain** a provision related to severance.

[Pl.'s Dep. Ex. 4].

48. Specifically, the Offer Letter provides:

Upon either of the below events occurring, Dubber will pay 1 year's Base Salary. Severance will only apply after the probation period has expired.

    1. Dubber Corporation including its American subsidiary is sold with the new owner not requiring the services of Todd Rowan post sale.
    2. Dubber Corporation ceases to have localized staff or generally ceases to operate in the American market, meaning that Todd Rowan would not be required within Dubber post such event.

In all other circumstances, general terms of employment will apply in relation to Severance.

[Pl.'s Dep. Ex. 4].

49. It is perfectly clear that neither of these two events occurred. [Slaney Dec. ¶¶27-28].

50. Dubber has not been sold. [Slaney Dec. ¶27].

51. And Dubber's American operations remain in place and have never ceased to operate. [Slaney Dec. ¶28].

52. Dubber owes no severance absent two limited qualifying events. [Pl.'s Dep. Ex. 4].

53. Neither event occurred. [Slaney Dec. ¶¶27-28].

54. Plaintiff has claimed that, during the pre-offer negotiations, a third-

9

party recruiter told him that Dubber would pay severance so long as Plaintiff was not terminated for "gross negligence." [Pl.'s Dep. 48:8-14].

55.   Plaintiff has produced no evidence validating that this communication occurred, and Plaintiff presented no evidence of a valid contract stating these terms. [Pl.'s Dep. 49:1-8].

56.   Regarding the ESOP, Plaintiff's Offer Letter only states that "[j]oining Dubber enables you to become part of the Employee Share Option Program (ESOP)." [Pl.'s Dep. Ex. 4].

57.   It is clear that the ESOP program was never created during Plaintiff's employment. [Pl.'s Dep. 130:2-3; Slaney Dec. ¶29].

58.   The Offer Letter certainly does not guarantee Plaintiff any number of shares; nor does it provide the value of the shares allegedly provided. [Pl.'s Dep. Ex. 4].

59.   Plaintiff also claims that Dubber owes him 25% of the increased revenue in his market (the United States) for the entirety of his employment with Dubber. [Pl.'s Dep. 99:25-100:10].

60.   As explained above, Dubber did in fact pay Plaintiff commissions during his employment – but never in the form of 25% of increased revenue. [Pl.'s Dep. 102:4-19].

61. Instead, Plaintiff appears to have assumed this 25% figure from an earlier email from Slaney prior to the issuance of the Offer Letter. [Pl.'s Dep. 105:3-25].

62. Specifically, Slaney – when suggesting how Plaintiff could reach his theoretical on target earnings – states that "this is how we view it . . . [y]ou also earn a percentage of the monthly revenue increase within this quarter of 25%." [Pl.'s Dep. Ex 3].

63. Later, when the Offer Letter was finalized and signed, the document did not include any mention of a 25% bonus commission formula. [Pl.'s Dep. Ex. 4].

64. Dubber in fact never agreed to pay Plaintiff any bonus commission. [Slaney Dec. ¶31].

65. Specifically, Plaintiff is owed his final commission check, amounting to $28,907.39, which did not become payable until after his termination. [Slaney ¶33].

66. In November 2018, Dubber attempted to meet with Plaintiff to provide him with a check. [Slaney Dec. ¶21].

67. Plaintiff, however, refused to accept anything short of the alleged hundreds of thousands of dollars that he asserts is owed to him in this litigation.

[Pl.'s Dep. 158:18-159:22; Ex. 11].

68. At any time, Plaintiff is able to accept the $28,907.39 in unpaid commissions. [Slaney Dec. ¶34].

69. Plaintiff candidly admits that, "I don't have proof to say if [Dubber's alleged misrepresentations] were intentional." [Pl.'s Dep. 137:9-138:7].

70. Dubber paid Plaintiff $180,000.00 per year plus commissions during his employment. [Slaney Dec. ¶35].

40722649.1