Appendix Exhibit 1
Todd Rowan Depo Excerpts & Exhibits



Deposition of:

# Todd Rowan

*October 17, 2019*

In the Matter of:

# Rowan, Todd Vs. Dubber, Inc.

Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Todd Rowan                    October 17, 2019
Rowan, Todd Vs. Dubber, Inc.

Page 38

1    Q. And how long were you unemployed between
2 Dubber and Tengo?
3    A. Whatever the timeframe is between October
4 26th and April 29th, 2019.
5    Q. Would you agree that's approximately six
6 months?
7    A. A little over.
8    Q. And what did you do during that period of
9 time?
10    A. Figured out how I was going to supply a
11 living for my family, since I was left with no
12 compensation, and continued to look for a job.
13    Q. Did you collect unemployment?
14    A. Yes, I did.
15    Q. Do you have records of those payments?
16    A. Yes, I do.
17    Q. Have you provided those to your attorney?
18    A. No, I have not. I believe you, your
19 firm, provided them in the documentations that you
20 provided to my attorney, from the state level, a
21 summary I recall seeing.
22    Q. I agree with that, but there was a
23 dispute earlier if we've produced those documents,
24 but now it seems like you've seen some, so we'll
25 leave that for another time. Do you recall if you

Page 39

1 collected the maximum amount of benefits?
2    A. Yes, I did.
3    Q. All right. Do you recall how you first
4 came to know of the role with Dubber?
5    A. Yes, a recruiter named John Butler called
6 me regarding the role.
7    Q. And have you previously posted -- had you
8 previously met John Butler?
9    A. No, I had not.
10    Q. And did John Butler work for Dubber?
11    A. He was their recruiter. I don't know
12 how -- the terms of his situation with Dubber was.
13    Q. Do you know if he worked for a recruiting
14 company?
15    A. I believe he did, yes.
16    Q. Do you recall the name of that company?
17    A. SearchLogix.
18    Q. And is that S-E-A-R-C-H-L-O-G-I-X, one
19 word?
20    A. Yes, I believe so.
21    Q. And what did Mr. Butler tell you about
22 the role?
23    A. That Dubber was expanding into the US,
24 they were wanting to structure a role similar to
25 how they expanded over into Europe, which was led

Page 40

1 by James Slaney and Nick Atkin from Dubber, which
2 was setting up an office, setting up a staff, head
3 count, managing sales, everything that they had
4 done to replicate the European and out of the
5 London office, they wanted me to do here in the US
6 since basically they didn't have the bandwidth to
7 move from Europe over here, and things were
8 progressing very quickly, according to them.
9    Q. And did John Butler tell you how he found
10 you?
11    A. He found me through his network.
12    Q. And what do you mean by his network?
13 Could you expand on that?
14    A. So I was networking, obviously, looking
15 for a job. He had reached into somebody that he
16 knew within his network asking if there was an
17 executive with my type of profile within the
18 Atlanta area because he was looking to fill this
19 position on behalf of Dubber, and my name was
20 provided.
21    Q. And had you previously provided a resumé
22 to SearchLogix?
23    A. No.
24    Q. Have you worked with any other recruiters
25 during the unemployment period?

Page 41

1    A. Yes.
2    Q. Can you list, or to the best of your
3 recollection, tell me some of the companies that
4 you worked with.
5    A. It's very difficult to say, because
6 recruiters, as you're saying, it can be internal
7 recruiters, they can be external recruiters
8 working on assignments. You know, I did not have
9 a dedicated outplacement company that I was
10 working with.
11    Q. And tell me about what an internal
12 recruiter is, just big picture.
13    A. Internal recruiter is somebody that is an
14 employee of the company that is hired to go fill
15 positions.
16    Q. And tell me a little bit about an
17 external recruiter.
18    A. External recruiter is usually an agent of
19 the company that's working on their behalf to hire
20 talent.
21    Q. What do you mean by agent of the company?
22    A. They are -- they are, in my experience,
23 they are required to be able to present what the
24 job is, what the job role requires, roughly what
25 the compensation level looks like, what the status

11 (Pages 38 - 41)

Todd Rowan                    October 17, 2019
Rowan, Todd Vs. Dubber, Inc.

Page 46

1    Q.  Do you have any notes of that
2 communication in your journal?
3    A.  I'd have to look.
4    Q.  To your knowledge, off the top of your
5 head do you know?
6    A.  I'd have to look to give you a firm
7 answer.
8    Q.  Did you try to contact John Butler as
9 part of this lawsuit?
10    A.  No.
11    Q.  Do you expect to call him as a witness if
12 this case proceeds to trial?
13    THE WITNESS:  Jim?
14    MR. VOYLES:  I don't get to answer.
15    A.  Oh, I'm sorry.  Yes.
16 BY MR. DONOHUE:
17    Q.  Have you attempted to get any written
18 statements from him summarizing your
19 communications?
20    A.  I personally have not.
21    Q.  Do you have any written communications
22 with John Butler post signing your offer letter?
23    A.  I don't recall.  If I do, it would be --
24 it would be an email.
25    Q.  Have you provided, to the extent that

Page 47

1 email exists, have you provided that to your
2 attorney?
3    A.  I've provided most, if not all of those
4 communications between John Butler and myself to
5 my attorney.
6    Q.  And how did you find those?  Did you
7 search his name on your email?
8    A.  Yes.
9    Q.  And did you use any other means of
10 communication with him other than email, in
11 writing?
12    A.  Phone.  Phone.
13    Q.  Did you exchange any LinkedIn messages?
14    A.  No.
15    Q.  Did he ever leave you a voicemail?
16    A.  He might have.
17    Q.  Does your phone currently retain any
18 emails from John Butler?
19    A.  No, it does not.
20    Q.  Have we exhausted all forms of
21 communication that you had with John Butler?
22    A.  Yes.
23    Q.  So tell me a little bit more about the
24 communication that you had with him, whether it be
25 before or after your termination, just to the best

Page 48

1 of your recollection how that conversation went,
2 what he said and what you said.
3    A.  What timeframe are we talking about?
4    Q.  You mentioned earlier that you spoke with
5 him about a severance issue either immediately
6 before or after your termination.  I'd just like
7 to know a little bit more about that conversation.
8    A.  Yes, so before the confirmation was,
9 John -- I can't paraphrase the exact thing,
10 obviously -- but it was confirming that when I
11 signed on board with Dubber that it was an
12 agreement that I would have a year's severance
13 should anything were to happen besides termination
14 for, you know, gross negligence.
15    Q.  And what did he say in response to that?
16    A.  He says, Yes, I'd back you up on that.
17    Q.  And do you have a written severance
18 agreement signed with John Butler?  Did he provide
19 you with a severance agreement?
20    A.  He's not my employer, so he wouldn't
21 provide me with a severance agreement, I don't
22 believe.
23    Q.  So he does not work for Dubber?
24    A.  I didn't report to John, so I received my
25 offer letter and documentation from James.

Page 49

1    Q.  So apart from that offer letter, the
2 question, were you provided with any separate
3 agreement?
4    A.  Not from John Butler.
5    Q.  Were you provided with any separate
6 agreement that covered severance apart from your
7 offer letter?
8    A.  No.
9    Q.  And you mentioned that you talked to him
10 over the phone.  Is that at the same cell phone
11 number you provided earlier?
12    A.  Uh-huh.
13    Q.  Have you changed providers since that
14 communication?
15    A.  No, I have not.
16    Q.  Have you changed numbers since that
17 communication?
18    A.  No, I have not.
19    Q.  Did you talk to him on a house line or
20 any other phone numbers?
21    A.  I don't recall.  I might have.
22    Q.  What other numbers would you possibly
23 have communicated with him on?
24    A.  It would be the home number.
25    Q.  And that's the one you previously

13 (Pages 46 - 49)

Todd Rowan
October 17, 2019
Rowan, Todd Vs. Dubber, Inc.

Page 50

1  provided?
2      A.  Yes.
3      Q.  When did you first speak with a Dubber
4  executive about the role?
5      A.  Probably around the March timeframe of
6  2017.
7      Q.  And who do you recall first speaking
8  with?
9      A.  James Slaney.
10     Q.  Do you remember his title?
11     A.  President and cofounder.
12     Q.  And how did that communication occur?
13     A.  Email initially to schedule a call, and
14  then later via the phone.
15     Q.  Do you still retain those communications
16  via email?
17     A.  I might.
18     Q.  Do you recall if you have turned those
19  over to your attorney?
20     A.  I don't recall that.
21     Q.  Did you ever text with James Slaney --
22  and we're talking about the prehiring timeframe
23  right now only.
24     A.  Uh-huh.
25     Q.  Did you ever text with James Slaney?

Page 51

1      A.  I may have.
2      Q.  Did you ever send him LinkedIn messages?
3      A.  No.
4      Q.  And to the extent there are text
5  messages, would it have been at the same phone
6  cell phone that you currently use?
7      A.  Yes.
8      Q.  Have you reviewed your cell phone to see
9  if you retain any text messages from James Slaney?
10     A.  Yes, I have.
11     Q.  To the extent you have, have you provided
12  copies of those to your attorney?
13     A.  I don't believe there were any.
14     Q.  So tell me just generally about how the
15  first call with James went and what was discussed.
16     A.  First call was talking about, very high
17  level, about my background, what they were looking
18  for, high level about where the company was, what
19  the company did, why they were looking to fill
20  this role.
21     Q.  And at the time that you spoke with him
22  about the role had you already accepted it, or was
23  it --
24     A.  No, this was very early in the hiring
25  process.

Page 52

1      Q.  Did you speak with any other Dubber
2  executives during the hiring process?
3      A.  Yes, I did.
4      Q.  Who were they?
5      A.  Nick Atkin.
6      Q.  Anyone else?
7      A.  Steve McGovern.
8      Q.  Anyone else?
9      A.  No.
10     Q.  Do you recall Nick Atkin's title?
11     A.  Nick Atkin is the head of solution
12  architecture for Dubber.
13     Q.  And did you email with Nick Atkin
14  prehire?
15     A.  It would have been just to schedule where
16  we were going to meet.  That was a face-to-face
17  meeting when he was in the United States.
18     Q.  I'll circle back to that in a second.
19  But what is Steve McGovern's title?
20     A.  Steve McGovern is the CEO of Dubber.
21     Q.  Do you recall ever e-mailing with Steve
22  McGovern during the hiring process?
23     A.  No.
24     Q.  Did you ever text Steve McGovern during
25  the hiring process?

Page 53

1      A.  No.
2      Q.  Send Steve McGovern any LinkedIn
3  messages?
4      A.  No.
5      Q.  Did you ever text Nick Atkin?
6      A.  It's possible.
7      Q.  Did you ever send a LinkedIn message to
8  him?
9      A.  No.
10     Q.  Have you reviewed your phone to see if
11  you have any text messages between you and Nick
12  Atkin?
13     A.  Not recently.
14     Q.  Could you at some point in the future?
15     A.  Yes.
16     Q.  Thank you.  So tell me a little bit more
17  about your meeting in person with Nick Atkin.
18     A.  We met over breakfast, I think it was at
19  J. Christopher's in Dunwoody, and really it was
20  a -- over breakfast.
21     Q.  And at what phase in the hiring process?
22  Was this about to be a done deal or was this
23  earlier?
24     A.  I'd say it's in the middle.
25     Q.  To your knowledge were they reviewing

14 (Pages 50 - 53)

Todd Rowan                    October 17, 2019
Rowan, Todd Vs. Dubber, Inc.

Page 66

1 about prior to taking a break that you'd like to
2 go back and address?
3     A.  Not at this time.
4     Q.  Okay.  So I mentioned that we're going to
5 look at another email, and we're not going to get
6 as in deep to this one which will be helpful to
7 you, I know that was not fun, but it's 110 to 114.
8     A.  Okay.
9     Q.  Does this appear to be, if you switch
10 back to 113 and 114, an email to you from James
11 Slaney dated April 3rd, 2017, 10:56 a.m.?  Do you
12 see that?
13     A.  Yes.
14     Q.  Okay.  And I'm not going to get too
15 specific into this, but does this appear to be
16 some back and forth where you're asking about how
17 different pieces of compensation work?
18     A.  May I take five minutes to review the
19 whole thing?
20     Q.  Absolutely.
21     A.  Thank you.
22         Okay, I'm sorry.
23         MR. VOYLES:  I was going to say, can we
24 go off the record for two minutes so I can talk
25 about the delivery of the exhibits yesterday?  Or

Page 67

1 put it on the record, I don't care.
2         MR. HARE:  Delivery of plaintiff's
3 exhibits to defendant or delivery of defendant's
4 delivery to plaintiff?
5         MR. VOYLES:  Defendant to me.
6         MR. DONOHUE:  Sure, let's go off the
7 record for that.
8         (Off-the-record discussion)
9 BY MR. DONOHUE:
10     Q.  All right.  Let's go back on the record.
11 Ready to talk?
12     A.  Yeah, real quick.  I checked my phone.
13     Q.  Okay.
14     A.  I do have a text message from me to Nick
15 Atkin.  It was postemployment and was really
16 centered around my dropping my equipment off and
17 making sure he was in the office.
18     Q.  Perfect.
19     A.  So you had asked me about --
20     Q.  That's great.  I really appreciate that.
21 I know sometimes it's difficult to go back in text
22 messages, but we like to cover that just in case
23 it's helpful.  That sounds more like you were
24 making arrangements to drop off like a laptop?
25     A.  Correct.

Page 68

1     Q.  Where did you drop that off?
2     A.  At our office right across from Lenox
3 Mall.  We were in a We Works office, in Atlanta,
4 Georgia.
5     Q.  Thank you.  I know exactly where that one
6 is.  I have a friend that works there as well.
7         Are you ready to tackle this email?
8     A.  Yes.
9     Q.  And again I'm not asking specifically,
10 we'll get into it, but does this generally appear
11 to be a back and forth between you and James about
12 various compensation prior to your employment?
13     A.  Yes.
14     Q.  Okay.  And if you go to page 112, there's
15 an email from you at 1620, April 3rd, 2017.  Could
16 you read that one.
17     A.  April 3rd, 2017 at 1620.
18     Q.  Yes.
19     A.  Yes.  Okay, let's make this simple.  I
20 trust the comp plan will be fair and equitable, so
21 I am not going to negotiate it as part of the
22 offer.  Let's just stick with the guarantee.
23 Thoughts?
24     Q.  And what are you talking about as far as
25 the guarantee there?

Page 69

1     A.  My concern was, so Hostopia and Dubber
2 operate on the same model, go-to-market model,
3 different products.  So I was well aware with sale
4 cycle links how things work, how revenues
5 forecasted, how revenues brought out.
6         Specifically what we're talking about on
7 the guarantee was if Dubber's run rate was not
8 actually what they said it was preemployment, it
9 would take awhile for us to start generating
10 commissionable results, which is the $120,000
11 portion of my complete OTE package.  Therefore, it
12 isn't uncommon to have a guarantee of commissions
13 based upon management-based objectives, or MBOs.
14 That is what we were specifically discussing.
15     Q.  And did you agree to a number on the MBOs
16 as part of this discussion?
17     A.  Yes, the final agreement was -- initially
18 it had been asked for a six-month guarantee.  What
19 was finally agreed was half of a quarter's
20 commissions at 100 percent for MBOs.
21     Q.  And did you receive that?
22     A.  Yes, I did, upon completion of those
23 management-based objectives I received it.
24     Q.  Okay.  And can you provide -- just read
25 into the record the date that this email chain is

18 (Pages 66 - 69)

Todd Rowan                                          October 17, 2019
Rowan, Todd Vs. Dubber, Inc.

Page 70

1  going back and forth?  It's two days, but I'll let
2  you . . .
3      A.  Sure.  And to be clear, it's 110 through
4  114?
5      Q.  Yes, sir.
6      A.  Okay.  I see here on 113 that James --
7  there's an email from James at April 3rd, 2017 at
8  10:56 a.m., and the last one on page 110, which is
9  also page 1 of 5, is dated Tuesday, April 4th,
10 again from James to me, 2017, at 10:44 a.m.
11     Q.  Great.  Thank you.  And I think the last
12 email we're going to look at -- yes -- last email
13 we're going to look at is 115 to 120.  So if you
14 take a minute and look at that one, I think it
15 covers some of the same, and again I'll just be
16 asking general questions about this one, but let
17 me know when you're ready for that.
18     A.  Okay.  And we're stopping on 120, right?
19     Q.  Yes, sir.
20     A.  Again, page 120 is --
21     Q.  I won't ask you about that, I promise.
22     A.  Thanks.  Okay.
23     Q.  So does this appear similarly to be an
24 email chain on August -- sorry, on April 4 th,
25 2017 between yourself and James Slaney regarding

Page 71

1  general questions about your comp preoffer?
2      A.  This specifically has to do with talking
3  about the comp which refers to -- I want to make
4  sure we're clear on this.
5      Q.  Absolutely.
6      A.  This has nothing to do with an annualized
7  comp plan.  This has to do with in the space of
8  how my -- because the salary structure is not
9  something that any sales executive is just going
10 to live off their salary, right.  So you rely on
11 something, salary and some kind of commissionable
12 or bonus offer.  So this is referring to in lieu
13 of a two-quarter guarantee, we tried to get to a
14 one-quarter guarantee so that I would at least
15 know I would make 100 percent of my OTE on
16 earnings for the first quarter in first quarter.
17 So a lot of this is around how can I make that
18 amount for first quarter.
19     Q.  And did that work out?  Do you have
20 issues with how that worked out big picture?  I
21 mean, it seems -- I'm going to read from 115, it
22 says, I think we're good, you're saying let's get
23 stuff signed.  Are you generally in agreement at
24 this point as to those issues?
25     A.  I'm in agreement on how it's going to --

Page 72

1  how it's going to be calculated and how he
2  believes I'm going to be able to make 100 percent
3  of my compensation for the first quarter.
4      Q.  I understand.  And we're going to get
5  into other things later, I just want to get to
6  that.  And then he responds -- and I'm going to
7  read it -- 2434, 15K MBO, 15K comp is the deal.
8  Do you see that?
9      A.  Uh-huh.
10     Q.  What does that mean?  Is that what you
11 were just telling me about?
12     A.  No.  So what that refers to is -- is the
13 question was around how is the MBO -- is the MBO
14 payment then removed from actual commissions
15 earned or is it 15K and then whatever commissions
16 earned afterwards as a separate calculation.  Do
17 you understand what I mean by that?
18     Q.  I do.  And were you on the same page with
19 him on that?
20     A.  What I was understanding was that my 15K
21 MBO would not be removed from any other
22 commissions earned on the compensation plan as
23 outlined.
24     Q.  And then below that he says, I'll put
25 this in the offer letter tonight.  Do you see

Page 73

1  that?  A couple of hurdles, top of the page, 115.
2  Right under the line I just read.
3      A.  Yes, uh-huh.
4      Q.  Okay.  And what is the date on that email
5  that he says, I'll put this in the offer letter
6  tonight?
7      A.  Tuesday, April 4th, 2017.
8      Q.  Thank you.  I'm now going to mark
9  Defendant's Exhibit 4.
10         (Defendant's Exhibit 4 marked)
11 BY MR. DONOHUE:
12     Q.  Do you recognize this document?
13     A.  Yes, I do.
14     Q.  And if you turn -- again, this is marked
15 Dubber Production five zeroes then 1 to Dubber
16 Production 4.  If you flip to Dubber Production 4,
17 is that your signature?
18     A.  Yes, it is.
19     Q.  And would you read the date below your
20 name?
21     A.  4/5/2017.
22     Q.  Does that suggest to you that you signed
23 this on April the 5th, 2017?
24     A.  Yes.
25     Q.  Do you have any reason to doubt that that

19 (Pages 70 - 73)

Todd Rowan                                    October 17, 2019
Rowan, Todd Vs. Dubber, Inc.

Page 74

1  is the date this was signed?
2      A.  No.
3      Q.  All right.  Scrolling back to the front
4  of this page, do you agree this is the offer
5  letter?
6      A.  Yes, based upon what I see here.
7      Q.  And we've talked a little bit about the
8  offer letter in these last couple emails.  Is this
9  the offer letter that is the fruition of that --
10  those emails?
11     A.  Not just the emails, but also verbal
12  conversations, et cetera.
13     Q.  And there's no other offer letter that
14  you're aware of.
15     A.  Not that I'm aware of.
16     Q.  Did you ever sign an offer letter and
17  they said, Let's scratch it and do a new one?
18     A.  I was provided an offer letter to sign.
19  I don't believe I signed it.  I believe I caught
20  the fact there was an error in it with regards to
21  currency.
22     Q.  And do you mean AUS to USD?
23     A.  Correct.  Not AUS, I believe it was
24  pounds sterling.  I don't recall.  It wasn't AUS,
25  I believe it was pounds sterling.

Page 75

1      Q.  And you corrected that, they sent you a
2  new draft, you signed that one, is that accurate?
3      A.  Correct.
4      Q.  And this is not a trick question, I just
5  want to make sure we're talking about the right
6  one.  To your knowledge is this the offer letter
7  that you signed?
8      A.  Yes.
9      Q.  All right.  So you were going to walk
10  through it a little bit.  It says your name, your
11  title, VP of sales.  Does the summary and
12  responsibilities and key responsibilities align
13  with what your role with Dubber was?  And again,
14  not a test, I just want to make sure that this is
15  the job you took.
16     A.  This was the job I took.  This wasn't
17  what the job became.
18     Q.  And we'll get to that, but I just want to
19  make sure, this isn't -- they didn't send you the
20  job description for the wrong job; is that
21  correct?  The VP of sales position was your -- it
22  was your role.
23     A.  Yes.
24     Q.  All right.  That's all I need to know.
25         So if you'll flip over to Dubber

Page 76

1  Production 2, top of it says report to James
2  Slaney.  Was that accurate?
3      A.  Yes.
4      Q.  Is that who you reported to throughout
5  your employment?
6      A.  Yes.
7      Q.  Did you report to anyone else throughout
8  your employment?
9      A.  No.
10     Q.  Then it says salary.
11     A.  Uh-huh.
12     Q.  Base, 180,000 per annum.  Is that
13  accurate?
14     A.  Yes.
15     Q.  Then it says OTE, 300,000 per annum, is
16  that accurate?
17     A.  Yes.
18     Q.  To your knowledge what does OTE mean?
19     A.  Base plus -- oh, OTE means on target
20  earnings.
21     Q.  Then the next line, am I correct that it
22  reads accelerators, unlimited based on
23  achievement?
24     A.  That's correct.
25     Q.  The next line, target and commission

Page 77

1  structures will be determined annually; is that
2  correct?
3      A.  That's what it says in this letter.
4      Q.  All right.  Scroll down a little bit to
5  MBO.  Does this sentence beginning with "upon"
6  represent the MBO promise that was made to you as
7  you just summarized it for me previously?
8      A.  Yes.
9      Q.  Do you agree that the second sentence of
10  that says additional sales achievements will be
11  separate to this structure?
12     A.  Yes.
13     Q.  And below it's got some key prospects and
14  some other things.  Does all of that look accurate
15  as you remember it?
16     A.  As I remember it, yes.
17     Q.  All right.  I want to go to deals.  Do
18  you see that deal definition?  At the bottom of
19  page 2.
20     A.  Yes.
21     Q.  Could you read the deal definition for
22  me.
23     A.  Sure.  A service provider or partner who
24  signs an agreement on Dubber to announce to our
25  investor market.

20 (Pages 74 - 77)

Todd Rowan                                          October 17, 2019
Rowan, Todd Vs. Dubber, Inc.

Page 78

1    Q.  Thank you.  Do you agree that the next
2  bullet point defines the word agreement as it's
3  used in the deal definition?
4    A.  I'm not following what you mean by that.
5    Q.  Sure.  So the definition says, A service
6  provider or partner who signs an agreement, and
7  then the next bullet says definition of agreement.
8  Do you agree with that?
9    A.  Service provider signs a master services
10  agreement with or without financial commitment.  I
11  agree that's what it says, yes.
12    Q.  Thank you.  And there are three
13  definitions there.  Do you see that?  Do you agree
14  with that?
15    A.  Uh-huh.
16    Q.  And did you understand at the time that
17  you signed this that this is how your compensation
18  that was tied to deals would be determined?
19    A.  I would refer to it was to, once again,
20  tie to the definition of closing one deal in the
21  first quarter to obtain my MBO.
22    Q.  Thank you.  And just to recall your
23  testimony, you did achieve that goal, correct?
24    A.  Correct.
25    Q.  And you did receive the MBO; is that

Page 79

1  correct?
2    A.  That's correct.
3    Q.  All right.  The next portion is titled
4  commission.  Do you see that?
5    A.  Yes.
6    Q.  Can you read that portion aloud.
7    A.  Commission calculation is based on the
8  increase of recurring revenue within the region
9  with accelerators for new service provider
10  agreements.  New agreements valued to Dubber are
11  when they can be announced to the Australian stock
12  market.
13    Q.  In that commission is there any formula
14  or percentage, that definition?
15    A.  Not in this document -- not in this
16  specific document.
17    Q.  Do you agree that this represents the
18  commission agreement that you entered with Dubber
19  at the beginning of your employment?
20    A.  No.
21    Q.  And what do you disagree with about that
22  portion?
23    A.  It doesn't link into any of the specifics
24  with regards to how commissions were calculated
25  and including the percentage of revenue.

Page 80

1    Q.  Did you sign a separate commission
2  agreement or contract contemporaneously with this
3  one?
4    A.  I was not given anything to sign in
5  regards to that.
6    Q.  And what commissions did you actually
7  receive during your employment?
8    A.  I received commissions based upon the
9  service provider agreements.
10    Q.  Will you flesh that out?  Assume I don't
11  know what any of those words mean and tell me
12  about it.
13    A.  Sure.  So Dubber's commission structure
14  was in two ways, as this is highlighting.  The
15  first way -- well, let's talk about how things are
16  sold at Dubber.
17    Q.  Yes, thank you.
18    A.  So after a regular sales cycle, due
19  diligence, proposals, commercial offerings, due
20  diligence on the company and the technology, et
21  cetera then you move into a contracting phase.
22  Contracting phase then goes through typical legal
23  review, contract's signed, right.  That initiates
24  a first payment as part of the commission plan
25  with Dubber for signing the agreement.

Page 81

1     Within those are specifically upon
2  signature, upon committed revenues or revenues,
3  you know, for Dubber, as well as what's called an
4  addressable market.  The second part of the
5  commission plan is also around recurring revenues
6  and a percentage of recurring revenues as they
7  increase within the quarter.
8     So what would happen would be you would
9  sign, signed agreement, because there's a delay
10  between when an agreement is signed and when a
11  customer can go live and actually start reselling
12  Dubber's services, there's part A of that plan
13  made up of those three parts where you are earned
14  commissions and then afterwards would be based
15  upon revenue obtained by Dubber and receiving a
16  percentage of that which would equate to your full
17  on target commissions, whatever they may be.
18    Q.  Aside from that process, those
19  objectives, did you receive any other commissions
20  from Dubber during your employment outside of that
21  process?
22    A.  My MBO.
23    Q.  Was there anything else?
24    A.  Not that I can recall.
25    Q.  Okay.  So -- and I don't want to put

21 (Pages 78 - 81)

Todd Rowan                                    October 17, 2019
Rowan, Todd Vs. Dubber, Inc.

Page 82

1 words in your mouth because you obviously
2 understand this way more than I do. You received
3 commissions based on those indicators and an MBO,
4 and that's all that you actually received while
5 you were employed there.
6    A. I never received any commissions with
7 regards to revenue.
8    Q. Okay. So I think this may help us a
9 little bit. I'm going to hand to you what has
10 been marked as Defendant's Exhibit 5.
11      (Defendant's Exhibit 5 marked)
12 BY MR. DONOHUE:
13   Q. I'll represent to you that this document
14 was provided to us by Dubber, and it's my
15 understanding represents commissions that were
16 paid to you in 2017. Take a second to review it
17 and please let me know if you agree with that
18 assessment.
19   A. So this is the first time I've seen --
20 well, this isn't dated, and I would need to go
21 back to my records to verify it.
22   Q. Understood.
23   A. But let me go through everything.
24   Q. Yes, please do.
25   A. I'm sorry.

Page 83

1      MR. VOYLES: Before we start I'm going to
2 put an objection on. Object to the form of the
3 question. These are not dated.
4      MR. DONOHUE: I understand.
5    A. What was the question again?
6    Q. Do you recognize the form of this
7 document? How about that.
8    A. Yes, I do.
9    Q. What is this generally, understanding the
10 objection?
11   A. Sure. So this is the spreadsheet on how
12 commissions are calculated based upon what the
13 process was I described to you previously, with
14 the exception of revenue.
15   Q. Talk to me about how revenue -- is that
16 separate?
17   A. This has to do with minimal committed
18 revenue.
19   Q. Okay.
20   A. Within a contract, versus ongoing revenue
21 based upon user adoption, licensed growth, et
22 cetera.
23   Q. And your contention is that during your
24 employment you were never paid a commission on the
25 revenue; is that correct? Apart from what you

Page 84

1 just explained.
2    A. Apart from what the guaranteed minimum
3 revenue commitment is in the contract, that is
4 correct.
5    Q. So there was no practice of them paying
6 you while you were employed the additional revenue
7 piece.
8    A. I wouldn't say there wasn't a practice,
9 more of a refusal.
10   Q. Understood. But you agree that at no
11 time, it's not like they paid you and then
12 stopped, just never got paid the whole time you
13 were there.
14   A. What I would say about my experience with
15 regards to getting paid commissions at Dubber was
16 that it was never done in a timely manner, it was
17 verbally told to me that one amount would be paid
18 and it changed after another, and I never
19 understood what the approval process was within
20 how commissions were approved. It seemed it
21 varied depending upon when we were trying to get
22 it.
23      In fact, the reason when I brought that
24 up to my supervisor James Slaney on why -- I'm
25 very used to working for companies that are --

Page 85

1 it's very structured, commissions are, in fact,
2 earned commissions, I've been told in the past
3 are, in fact, wages, so they're something that
4 need to be locked down, that the -- James
5 indicated to me verbally that Dubber was just not
6 used to paying commissions. And so that was the
7 excuse for being haphazardly, I guess, with
8 regards to it.
9    Q. Okay. But does this document represent
10 how you reported the commissions that you were
11 actually paid?
12   A. This document would be produced by
13 Dubber. As far as the commission report. So when
14 I would initially report -- the process that they
15 requested, when I would initially either -- either
16 they would figure it out or I would figure it out.
17 Like I said, it wasn't really a process, it was a
18 haphazard effort as far as what it was. And then
19 eventually prior to it being paid out they would
20 submit this sheet and say, Here it is, this is
21 what you're going to get paid.
22   Q. So just yes or no, this is the document
23 that represents the commissions that you were
24 actually paid during your employment.
25   A. This is -- this is a -- okay, again, I

22 (Pages 82 - 85)

Todd Rowan
Rowan, Todd Vs. Dubber, Inc.

October 17, 2019

Page 86

1 just want to make sure we're very crystal clear.
2 Without having a date on it, this is the format
3 that was presented in how the commissions were
4 going to be calculated and paid.
5     Q. And that's the question. I apologize if
6 I wasn't more clear. This is not foreign to you,
7 this is not the first time you've seen something
8 like this.
9     A. No, sir.
10    Q. Okay. You see the key as it were up
11 here, per single point 2500, do you see that?
12    A. Uh-huh.
13    Q. Does all of that look the same from when
14 you recall dealing with this form?
15    A. Yes.
16    Q. And if you'll scroll -- I keep saying
17 scroll, I'm used to technology -- if you flip
18 there, as I understand it, there are two tabs to
19 this type of document; is that correct?
20    A. Yes.
21    Q. Does the document saying 15,3625
22 represent the account manager commissions?
23 Because it's per single point 2500, is that right?
24    A. Yeah, so to be clear --
25    Q. Yes.

Page 87

1     A. -- they had -- while myself or my
2 counterpart in Europe, Yanif, had no direct staff
3 reporting in to getting these agreements, we were
4 paid as both the sales manager which you see in
5 this tab and as the account manager, because which
6 in effect we were, so that's the clarification on
7 both.
8     Q. That's exactly what I was asking. I
9 appreciate you walking me through that. Because
10 the reason that it seems relevant is the per
11 single point is 750 for the sales manager, but
12 it's 2500 for the account manager. Is that
13 accurate?
14    A. Yeah, so there's -- to be clear, the way
15 it was presented was that you would get both.
16    Q. For the sales while you were serving as
17 both account manager and sales manager; is that
18 right?
19    A. Yes, correct.
20    Q. Thank you. I know it's complicated and I
21 promise I'm not trying to trick you, I just want
22 to understand as much as I can about these
23 documents.
24    A. I'd be very disappointed if you were
25 trying to trick me.

Page 88

1     Q. Okay. Apart from what's on this document
2 in the form of this document, were you paid any
3 commissions separately?
4     A. No, not that I can recall.
5     Q. And were you given any documents to show
6 how these numbers were being calculated, a
7 commission plan?
8     A. This was what I was told was going to be
9 the commission plan until I had repeatedly asked
10 during the terms of my employment for a more
11 formal compensation plan, which was not provided.
12    Q. So you didn't sign or agree to any other
13 type of separate commission contract or agreement.
14    A. None was ever existed, even though they
15 were promised that it was going to.
16    Q. And you mentioned that this would be
17 provided by Dubber. What did you provide them
18 with in order to get to these numbers? Did you
19 provide -- did you have your own spreadsheet that
20 you would provide that they would summarize? Walk
21 me through that. Basically where did they get
22 these numbers from? And not these numbers
23 specifically, just speaking of the form.
24    A. Sure. The first column, so if you would
25 say CDK as an example, service provider, yes,

Page 89

1 amount, 3750, on the second tab where it would say
2 CDK service provider yes, and it's hard to
3 describe because this isn't working off an Excel
4 spreadsheet so I can't give you the rows, columns,
5 all that good stuff, amount 1125. Contract
6 signature initiated that payment.
7         Committed revenue would just be an area
8 where we knew that we were going to have a minimum
9 amount of revenue from the customer. That could
10 be in the form of a payment for infrastructure
11 services, that could be in the form of monies
12 collected, for professional services, or that
13 could be in the form of if we migrated over
14 recording users or in effect licenses onto the
15 platform that we knew exactly what those would be.
16    Q. Thank you.
17    A. Addressable market, to finish off.
18    Q. Yep.
19    A. Subject to interpretation as
20 recognized -- as pointed out by me and recognized
21 by James. I'll give you an example. AT&T has
22 millions of customers. Is that their addressable
23 market? Is their addressable market their
24 business customers? Is their addressable market
25 their customers here in the United States?

23 (Pages 86 - 89)

Todd Rowan                                    October 17, 2019
Rowan, Todd Vs. Dubber, Inc.

Page 98

1 at issue here?
2     A. No.
3     Q. From this -- just from the addressable
4 market deals and revenue. And if not, what do you
5 contend that number is that's at issue here?
6        MR. VOYLES: Object to the form of the
7 question.
8     A. Again, it's very hard for me to answer
9 because there's pieces missing here. I also --
10 this also -- I would want to make sure that what
11 was in here as far as what was owed is also
12 calculating correctly what was already paid. It's
13 very difficult to ascertain from this sheet when
14 we don't know where it came from.
15    Q. But generally you know the amount of
16 commissions that are kept with this within this
17 form, this type of category that's reported this
18 way that you contend were not paid to you.
19 Correct?
20    A. Okay. So --
21    Q. That's what I'm trying to get into here.
22    A. Okay, sure. So I will -- without --
23 we've submitted, I think -- there's two areas
24 of -- three areas of commissions where I'm arguing
25 I was not paid. The first came from James Slaney

Page 99

1 regarding a commission payment that he said would
2 be paid at the end of February of 2018. That
3 figure was 28,000 and something plus $5,000 if we
4 received professional services fees from Cox.
5 That was noted, and I know you don't have the
6 journals -- that's noted in the journal from a
7 conversation that I had. That commission
8 statement, payment, even though it said it would
9 be paid at the end of February, was not paid until
10 June 15th of 2018. Also after inquiring if the
11 withholding of these commission payments are
12 the -- I shouldn't say withholding, the lag of
13 paying them to me was hurting me, which was in
14 March, to which I replied yes.
15       When they came across my desk in 2015 --
16 I'm sorry, in June, apologize, correct myself --
17 when it was paid out in June and I was submitted
18 with a spreadsheet that looks like this, it was
19 short roughly $13,000 compared to what James had
20 agreed on. James then rejustified why that number
21 was changed. I do not know who changed that
22 number, from what he said to five months later.
23 But that was -- that's one thing I'm seeking to
24 recover that I did not agree with.
25       The last part of the commissions that

Page 100

1 were owed were begun to be discussed right around
2 August or September of 2018. I submitted to James
3 what I believed the amounts were based upon these
4 figures and figures that they had input into
5 previous commission statements, and that still has
6 not been paid to me to date.
7        The last piece of commissions I'm seeking
8 to recover was the increase in recurring revenues,
9 percentage increase in recurring revenues, which
10 we've already briefly discussed.
11    Q. So two, that piece, August to September
12 2018, does this look generally like those
13 commissions?
14       MR. VOYLES: Object to the form of the
15 question.
16 BY MR. DONOHUE:
17    Q. You can still answer.
18       THE WITNESS: Pardon?
19       MR. VOYLES: You can still answer.
20    A. Okay. So Bell Canada, as an example, was
21 one that was due payment. That's not in here.
22 BY MR. DONOHUE:
23    Q. What would you approximate that category
24 two amount owed to you as? August to September
25 2018 that you're contending has not been paid.

Page 101

1    A. I would approximate it to be between --
2 off the top of my head roughly 30 to $35,000 for
3 that specific piece.
4    Q. And what would you approximate the third
5 category, the recurring revenues, is owed?
6    A. So I had repeatedly during the time of my
7 employment verbally and in writing to have what
8 the actual revenue run rates were for my
9 customers. I did it for two reasons. The first
10 is to -- part of what we do at Dubber is highlight
11 how what we provide to service providers can help
12 them increase revenues and customer satisfaction
13 within their own customer base. So being able to
14 show revenue growth rates and run rates as part of
15 a quarterly business review with a client and/or
16 removing the name and showing those types of facts
17 and figures of success are integral in helping the
18 existing clients grow and obtaining new clients.
19       Also, I was requesting them because I
20 wanted to know what the revenues were in the
21 region for compensation purposes. Those were
22 continually denied. So -- did that answer what
23 your question was?
24    Q. No. What approximate amount do you
25 contend is owed to you in category three for the

26 (Pages 98 - 101)

Todd Rowan                                    October 17, 2019
Rowan, Todd Vs. Dubber, Inc.

Page 102

1 increase in recurring revenue?
2     A. So I believe what I submitted at the time
3 of my termination was around $78,000.
4     Q. And were you ever paid commissions during
5 your employment on the increase in recurring
6 revenue?
7     A. No.
8     Q. Do you have any separate agreement signed
9 by Dubber to pay you an increase in recurring
10 revenue?
11     A. I have an email from James Slaney
12 stating, and my offer letter refers to being paid
13 based upon an increase in recurring revenues
14 within my region.
15     Q. So all you have -- I just want to make
16 sure that's it. So you've got an email from James
17 and the offer letter. Anything else?
18     A. Verbal commitments.
19     Q. All right.
20        MR. DONOHUE: I'm marking what's going to
21 be labeled Defendant's Exhibit 7.
22        (Defendant's Exhibit 7 marked)
23 BY MR. DONOHUE:
24     Q. Take a second and look at this and let me
25 know when you're ready to answer about it. My

Page 103

1 first question will be have you seen this before,
2 so just let me know when you're prepared to answer
3 that.
4     A. Yes, my attorney presented this to me.
5     Q. And again, for purposes of this, same
6 disclaimer as earlier, I do not want you to tell
7 me what you and your attorney discussed, so I want
8 to stick with yes or no.
9        Did your attorney explain to you what
10 this is?
11     A. Yes.
12     Q. Do you, as you sit here, understand the
13 consequences if we proceed to trial and you're
14 awarded less than $50,000?
15     A. I understand what it means based on what
16 my attorney told me.
17     Q. Okay. And again, from the category two,
18 you contend that you're owed somewhere between 30
19 and $35,000 in commissions, just in category two;
20 is that correct?
21     A. That's not my total commission claim.
22     Q. Again, that was not the question.
23 Just -- I'm going to ask it again, and I'm
24 attempting to make it a yes or no.
25     A. Okay.

Page 104

1     Q. You contend that for the category of
2 August to September 2018 commissions as paid and
3 reported on this document right here, you contend
4 the amount that you're owed is between 30 and
5 $35,000; is that correct?
6     A. Roughly, based on what we discussed.
7     Q. I would really like a yes or no.
8     A. Yes.
9     Q. Thank you.
10     A. Sorry, I'm trying to be as factual as I
11 can.
12     Q. And I appreciate that, and, like I said
13 earlier, I don't want to rob you of the
14 opportunity to explain your answer, it's just that
15 where it's a yes or no for the court reporter and
16 for the record we appreciate it be answered that
17 way. If at any point you feel that you need to
18 expand on that more, I do not intend to discourage
19 you from doing so.
20        We're going to look again at Defendant's
21 Exhibit 3. And then after this I believe we'll be
22 at a reasonable stopping point to get some lunch.
23 And I would just point your attention to Dubber
24 Production 110, 110.
25     A. 110110?

Page 105

1     Q. Sorry, 110, in other words, document 110.
2     A. Dubber Production 0000110, yes?
3     Q. Yes. Do you see the email at the very
4 top of the page James Slaney to Todd Rowan April
5 4th, 2017, do you see that?
6     A. Uh-huh.
7     Q. Item number 2, revenue increase within
8 this quarter of 25 percent. Do you see that?
9 Bullet point number 3.
10     A. Yes.
11     Q. Is this the email you were talking about
12 a minute ago regarding the increase of recurring
13 revenue?
14     A. This is -- this is not the only thing I
15 was talking about with regards to the increase in
16 recurring revenue. But this is the only
17 percentage that was -- I could point to in writing
18 on what they meant by the percentage of recurring
19 revenue.
20     Q. Thank you. And you will agree that it
21 says you also earn a percentage of the monthly
22 increase within this quarter of 25 percent. Do
23 you agree that it says that?
24     A. Yes, that's what it states in this
25 portion of the sentence.

27 (Pages 102 - 105)

Todd Rowan                                October 17, 2019
Rowan, Todd Vs. Dubber, Inc.

Page 126

1    A.  Can you be specific?
2    Q.  Did you have -- so you just described to
3  me one verbal conversation where you talked about
4  your expectations as it relates -- was that the
5  end, or were there further discussions?
6    A.  Well, one I've already highlighted was
7  postemployment where I said were we clear and that
8  we had an understanding that we had a year's
9  severance unless terminated for cause, et cetera,
10 and some of the other things that we were brought
11 up, and that they put that in the offer letter and
12 he said yes.
13   Q.  So where in the offer letter is the
14 portion about any severance unless you're
15 terminated for cause?
16   A.  I believe it's where it says general
17 terms of employment will apply.
18   Q.  And what leads you to believe that a
19 general term of employment is that severance
20 applies in every instance except cause?
21      MR. VOYLES:  Object to the form.
22      Go ahead.
23 BY MR. DONOHUE:
24   Q.  You can still answer.
25   A.  Oh.  In my experience with having

Page 127

1  severance agreements and negotiating them, that is
2  a very common term to refer to when you're talking
3  about for cause, subject to how cause is defined
4  by an employer in a formalized human resources
5  document.
6    Q.  And do you agree that the services to be
7  rendered by this offer letter were to be provided
8  in Georgia, like were you in Georgia at the time
9  that you signed this?
10   A.  Yes, I was in Georgia at the time that I
11 signed this.
12   Q.  And your understanding that your role is
13 to be performed in the state of Georgia.
14   A.  My role was an America's role.
15   Q.  But you were physically located --
16   A.  I was physically located in Georgia, but
17 services -- things I was doing for the company
18 were not just Georgia based.
19   Q.  Did you sign it in Georgia?
20   A.  Yes.
21   Q.  Page 4.  Did you ever have an office
22 outside of Georgia?
23   A.  No -- Dubber has.
24   Q.  But did you ever work -- were you ever
25 located for Dubber anywhere outside of We Work in

Page 128

1  Buckhead?
2    A.  Yes, but it was still in Georgia.
3    Q.  And in your experience are you aware
4  generally of the term employment at will?
5    A.  I've heard of it, yes.
6    Q.  Did James Slaney ever tell you verbally
7  or in writing that he would pay you severance
8  unless you were terminated for cause?
9    A.  James Slaney on my exit when he told me I
10 was no longer needed, I had asked him, I said,
11 What about severance?  He said, Your severance
12 will be paid based on what we -- how did he say
13 it?  He said severance would be paid in November.
14 Eric, specifically meaning Eric Beylin, will be
15 the one figuring it out.  At no time did he say,
16 You do not have a severance.
17   Q.  But did he ever tell you prior to that
18 point that you would be paid severance except --
19 unless you were terminated for cause?
20      MR. VOYLES:  Object to the form of the
21 question, argumentative.
22      You can answer.
23 BY MR. DONOHUE:
24   Q.  You can answer.
25   A.  Oh, okay.  I don't recall a specific

Page 129

1  conversation I could point to.
2    Q.  Have we now talked about everything that
3  you contend is owed to you related to severance?
4    A.  I believe so, yes.
5    Q.  All right.  Is it also true that you
6  contend in this lawsuit that you are owed ESOP
7  payments?
8    A.  Yes.
9    Q.  What does ESOP stand for?
10   A.  Employee stock option program, based on
11 what my understanding of it is.
12   Q.  I think that's right.  It could be
13 ownership plan, but what we're talking about is
14 that your contention is that you're owed shares of
15 the company, essentially, as part of participating
16 in your employment; is that correct?
17   A.  Correct.
18   Q.  And what makes you believe that you are
19 owed ESOP payments?
20   A.  I was made verbal promises and I was told
21 throughout terms of my employment with specific
22 timeframes that ESOP plan was going to be created
23 and launched.
24   Q.  Do you have any personal knowledge of
25 when the ESOP program, or if it ever did actually

33 (Pages 126 - 129)

Todd Rowan                                    October 17, 2019
Rowan, Todd Vs. Dubber, Inc.

Page 130

1  roll out?
2      A.  It was never rolled out during the terms
3  of my employment.  I do believe it has been rolled
4  out.  However, I was not with the company, so I
5  can't say when.
6      Q.  Do you have any documents in writing
7  where Dubber tells you that you are going to be
8  paid ESOP?
9      A.  My offer letter refers to ESOP.
10     Q.  Any documents other than the offer
11 letter?
12     A.  The email that we just went over refers
13 to ESOP payments.
14     Q.  Any other documents that you're aware of?
15     A.  Notes from conversations, but those -- I
16 don't know if those journal notes that we're
17 referring to count as documents or not.
18         MR. DONOHUE:  Okay.  And I'll just
19 restate for the record that we have not yet had
20 the opportunity to review any journal.
21 BY MR. DONOHUE:
22     Q.  What amount of shares do you believe that
23 you're owed?
24     A.  Between 100 and 200,000 year on year, so
25 I would say anywhere between 150 to 250,000, since

Page 131

1  I was there a year and a half.
2      Q.  And what are you basing that on?
3      A.  The email that we just went over saying
4  100 to 200,000 year on year.  Also based upon the
5  verbal timing when James explained to me on when
6  shares were going to be distributed, the history
7  of why -- when they've tried to launch it before
8  and how it needs to be launched again, et cetera.
9      Q.  Are you aware of anyone who was employed
10 while you were employed who received ESOP shares?
11     A.  There was a -- so there was a stock award
12 given prior to my employment of where certain
13 employees were given shares of stock.  The reason
14 why I was told they're rethinking the ESOP plan is
15 the way they were supposedly distributed incurred
16 a tax liability, unforeseen tax liability to the
17 employees that they then had to make reparations
18 for, right, or figure out, because they didn't
19 know how to do it from a taxable situation.
20         So that's what they were working to do is
21 figuring out how to do that so that, let's just
22 say I go -- here you go, here's X amount of
23 options, you're like great, I'm so happy as an
24 employee, and then the tax -- when you go to file
25 your tax returns you have an unexpected tax bill

Page 132

1  you weren't relying on.
2      Q.  Are you aware of anyone who was hired
3  after you who received an ESOP shares while you
4  were still employed there?
5      A.  I am personally not aware, no.
6      Q.  Have you ever seen a plan, ESOP plan
7  document or anything that would detail how or when
8  that payment -- that program was going to roll
9  out?
10     A.  I was -- oh, okay, so I was -- within the
11 journals there was a conversation that said the
12 ESOP plan was going to go before the board -- this
13 was around 2017 -- to be done in a company-wide
14 all-hands call to all the employees in Dubber.
15 Steve McGovern alluded to having the ESOP plan
16 finalized in February of 2018, I think.  I might
17 not be completely accurate on that.
18         Furthermore, James had supposedly gotten
19 very upset that he had heard that I didn't believe
20 an ESOP plan was being rolled out and was
21 extremely heated and upset, saying -- he kept --
22 repeatedly said, Do you not believe we're going to
23 have an ESOP plan rolled out by March 30th, 2018,
24 to which I responded, Are you telling me that
25 we're going to have an ESOP plan rolled out by

Page 133

1  March 30th, 2018?  This went back and forth in an
2  exchange about four or five times, and I said, If
3  that's what you're telling me, I trust you.
4      Q.  Was the ESOP program rolled out in March
5  2018?
6      A.  No.
7      Q.  Have you ever participated in an ESOP
8  program prior to this?
9      A.  Yes, in different forms.
10     Q.  For which companies were you
11 participating --
12     A.  BellSouth and Vodafone are the two I can
13 definitely recall.
14     Q.  Were you still employed at the time that
15 those ESOP programs were rolled out?
16     A.  Yes.
17     Q.  So is your claim essentially that the
18 ESOP program was not rolled out while you were
19 employed there?
20     A.  My claim is is that I was made false
21 promises to be lured into working for a company
22 that had no commitment of fulfilling any of these
23 promises that they had expressed to me.  That's
24 where ESOP is one of the categories that that is
25 falling into.  Obviously as a startup, one of the

34 (Pages 130 - 133)

Todd Rowan
October 17, 2019
Rowan, Todd Vs. Dubber, Inc.

Page 134

1 attractiveness of a startup is to participate in
2 the early shares and share raises of it as part of
3 taking that risk to hopefully -- and including
4 taking a cut in what I had been making as a base
5 salary before -- to go ahead and invest your time
6 in making that company successful.
7     Q. Have we now talked about everything that
8 you contend is owed to you regarding the ESOP?
9     A. At this time that's what I can recall,
10 yes.
11     Q. All right. Is it correct that you're
12 also bringing a claim for fraud?
13     A. Yes.
14     Q. And generally speaking, and I understand
15 that your attorney will make the arguments for
16 you, but generally speaking what are you basing
17 the claim for fraud on?
18     A. The fact that the company misrepresented
19 what my package was going to be, what my job
20 responsibilities were going to be, and, most
21 importantly, what the state of the company was
22 financially at the time I joined.
23     Q. And who do you contend made those
24 representations?
25     A. James Slaney and Steve McGovern.

Page 135

1     Q. Anyone else other than them?
2     A. Not that I can recall.
3     Q. And what are you basing your position
4 that they were misleading you on? Have you talked
5 to them about it?
6     A. Yes, absolutely. One of the first
7 questions I asked was, What's the state that the
8 company's in? Where is it with regards to how
9 many customers you have, what the contracts are
10 written, how many users are on board, how many
11 users are coming on board, to kind of gauge a run
12 rate in my earnings ability or in the company's
13 viability of it being an ongoing interest.
14 They're a publicly traded company that has yet to
15 make a profit, so I didn't want to come into a
16 company that was in financial difficulties.
17     Q. And did they ever tell you that the
18 information that they provided to you was false?
19     A. They never told me it was false. It was
20 proven false when I joined.
21     Q. What proved it to be false?
22     A. As an example, they referred to the fact
23 that they had -- and I don't have the exact
24 numbers in front of me -- prior to my employment
25 hundreds of thousands of users under contract and

Page 136

1 an estimated run rate of millions of dollars. If
2 you refer to any one of their annual reports, they
3 will show that there were nowhere near that and
4 nowhere near even achieving that run rate at the
5 time.
6     Q. Were those annual reports available
7 publicly?
8     A. Yes, they're publicly traded on the
9 Australian exchange. You can freely look up
10 anything around there. What wasn't freely
11 available is forward projections. So it's always
12 a backwards-looking view, this is what we did last
13 year, this is what we did last quarter. This was
14 talking about forward, here's where we are, here's
15 where we're going to be.
16     Q. And did you ever look at those annual
17 reports prior to coming on board at Dubber?
18     A. Yes. That's what I was concerned
19 about was their fact that they were burning cash at an
20 alarming rate and they were going to be required
21 to do continual capital raises to stay afloat
22 unless they were producing revenue through sales,
23 et cetera.
24     Q. And is it your position that those annual
25 reports that you reviewed prior to joining Dubber

Page 137

1 were false?
2     A. No. The annual -- I don't know. I'm not
3 an independent auditor for the Australian stock
4 exchange, so I just go by what's in the annual
5 report: the pipeline, the amount of customers
6 that were going to be billing, the revenue run
7 rate forecasts. So let's just say the 12-month
8 forward look was completely inaccurate.
9     Q. Is it fair to characterize what you were
10 talking about as a -- you're contending it's an
11 inaccurate forecasting?
12     A. Dubber's either intentionally or
13 unintentionally had a problem with drilling down
14 into the detail with regards to numbers of
15 revenue.
16     In fact, one of -- it's been publicly --
17 it's in the press, in the Australian press, that
18 one of their investors, and I forget who the guy's
19 name was, I think it's Alex, but he runs a hedge
20 fund called Thorney Investment or Thorney Capital,
21 specifically pointed out that that was one of the
22 things he was most upset about with dealing with
23 the company.
24     Q. But you're not aware if it's intentional
25 or unintentional?

35 (Pages 134 - 137)

Todd Rowan                    October 17, 2019
Rowan, Todd Vs. Dubber, Inc.

Page 138

1     A. If it's unintentional I'd be shocked at
2 the incompetence, put it that way. But I don't
3 have proof to say if it was intentional. You'd
4 have to look at the books.
5     Q. Have we now talked generally about
6 everything that is contained within your claim for
7 fraud against Dubber?
8     A. So to be clear, severance, the agreement
9 on severance, the commissions, the ESOP, the state
10 of the company, what my job actually was going to
11 be based on roles and responsibilities was also
12 there. And that's all I can think of right now,
13 as far as specifics. I'm sure there might be
14 more.
15     Q. And I understand that, but I would like
16 to give you an opportunity just to think about it
17 because this is, you know, that part of the case
18 where you do tell me about that. So I would like
19 to be able to address whatever it is that you
20 contend. So would it be helpful to just
21 brainstorm for a minute? Is there something else
22 that would be helpful for you to recall?
23     A. Yeah. Let me think for just a minute,
24 please.
25     Q. Not a problem. Just let me know.

Page 139

1     A. Actually, to make sure I'm completely
2 accurate, may I get a copy of our claim?
3     Q. Sure.
4     MR. VOYLES: Have you got one?
5     MR. DONOHUE: I'll go ahead and admit it.
6 That's where I was headed anyway. We're now going
7 to mark what's been labeled Defendant's Exhibit 9.
8 If you'll take a second and review that. And
9 while you review it is okay if we go off the
10 record so I can run to the restroom?
11     MR. VOYLES: Sure.
12     MR. DONOHUE: While we're off feel free
13 to look at that in detail.
14     THE WITNESS: Thank you.
15     (Recess 2:54 p.m.-2:57 p.m.)
16     (Defendant's Exhibit 9 marked)
17 BY MR. DONOHUE:
18     Q. We'll go back on the record. All right.
19 So we were talking about the complaint. The
20 question asked was, Have we now talked about
21 everything related to your fraud claim? You asked
22 to review it, you've reviewed it. Go.
23     A. The other thing that was misrepresented
24 where I think is two other areas which is
25 fraudulent. One was 401(k), and continuing COBRA

Page 140

1 benefits, as well as, you know, some of the things
2 that were mentioned as far as the short-term,
3 long-term disability insurance, things like that.
4 Those were presented as going to be developed and
5 provided. They never were.
6     In fact, specifically around the 401(k)
7 when I asked James, Where's the 401(k) plan as we
8 were looking to perhaps hire more people in the
9 US, that's what people were asking me about. He
10 said, I thought that was already taken care of, to
11 which I said, No. He specifically said Eric
12 Beylin had already done it.
13     The other thing for fraud is I was part
14 of, as being really at the time the only US
15 employee, I would have to make statements to
16 immigration attorneys for visas for Nick Atkin and
17 also for Adrian, and I can't pronounce his name,
18 I'll butcher it, Di Pietrantonio, or something. I
19 don't recall, but my concern was that based upon
20 what I was expressing to those attorneys based
21 upon what Dubber's plans were for the US that from
22 what Dubber was telling me, that was not accurate
23 either.
24     Q. What specifically were you representing?
25     A. Okay. So specifically for Nick Atkin,

Page 141

1 one of the concerns under the present immigration
2 environment that we have here in the US is that
3 you're not filling the country with a bunch of
4 expatriates when you can pull from local talent.
5 So around what's the plan for expansion for local
6 employees, US-based employees, is this your
7 understanding that this is how you're going to be
8 expanding in the US, which was my understanding
9 that we were going to be doing for expanding the
10 US, that was never done.
11     Q. Okay. So let's take those at a time.
12 For 401(k), COBRA and benefits, do you have any
13 evidence as to whether those representations were
14 intentional or unintentional?
15     A. I think it was intentional.
16     Q. Based on?
17     A. Based on what I -- well, one, I thought
18 if James is telling me, Well, I think it was
19 already in place and then it's not in place, there
20 was an intent not to put it in place for some kind
21 of reason.
22     Q. So is that your interpretation of a
23 statement that was made or did someone tell you
24 that was false?
25     A. I don't follow, sorry.

36 (Pages 138 - 141)

Todd Rowan
October 17, 2019
Rowan, Todd Vs. Dubber, Inc.

Page 142

1    Q.  Did James tell you that they never had
2  any intention of putting into place a 401(k),
3  COBRA or benefits program, yes or no?
4    A.  I don't know what -- no, he never
5  explicitly said, It's not our intention to do it.
6    Q.  Thank you.  And same question for the
7  statements regarding immigration about the growth
8  of Dubber.  Did James have a conversation with you
9  to tell you that they had no intention to do that?
10  Yes or no?
11    A.  He never specifically said they had no
12  intention to do that.
13    Q.  Thank you.  Have we now talked about
14  everything that you contend is part of your fraud
15  claim?
16    A.  I believe so.
17    Q.  All right.  We'll go through the
18  complaint a little bit more in a second.  I just
19  want to talk briefly, if you could, to describe
20  the circumstances surrounding the termination of
21  your employment with Dubber.
22    A.  Sure.
23    Q.  Just generally tell me about it.
24    A.  I was called out of the blue on Friday,
25  October 26th.  I was asked if I could hop on a

Page 143

1  quick call.  I said sure.  We got on a video call.
2  James was on it, Adrian was on it.  James said,
3  It's not working out, I don't need to discuss it,
4  and I don't have to.  The employment is officially
5  ended, and that's it.
6    Q.  Was there anyone else on the call to your
7  knowledge except for James and Adrian?
8    A.  Not that I'm aware of.
9    Q.  What was your response?  Did you --
10    A.  I said, What do you mean, it's not
11  working out?  Steve McGovern was just publicly
12  stating that we had exponential growth within here
13  in the US.  James said, I don't need to discuss
14  that.  And then I said, as I've stated previously,
15  I said, Well, what about severance, things like
16  that?  And then James had the response that I've
17  already previously put into the record.
18    I also believe that James recorded the
19  call.
20    Q.  What makes you believe that?
21    A.  In the software tool that we were using
22  to communicate there's an indicator that shows
23  when the call is being recorded, and I believe I
24  remember seeing that indicator on.
25    Q.  Did you discuss your termination with any

Page 144

1  current Dubber employees at the time?
2    A.  What do you mean by discuss?
3    Q.  I would prefer to hear your
4  interpretation first and then I'll ask more
5  specific questions.
6    A.  Nick Atkin, I've been terminated, I need
7  to drop off my computer and things to you.  When
8  can we do it.
9    Q.  Anything other than that?
10    A.  No.
11    Q.  Have you talked with Nick Atkin after you
12  dropped off the laptop at all?
13    A.  No.  Not that I can recall.
14    Q.  Have you reached out or had any contact
15  with any former Dubber employees?
16    A.  Yes.  After John Rowe left Dubber he
17  joined a new company called Twilio.
18    Q.  Can you spell that?
19    A.  T-W-I-L-I-O.
20    Q.  I won't hold you to it.
21    A.  There was a position open at Twilio and I
22  wanted to just catch up with him and, you know,
23  talk to him about how he's enjoying that company,
24  things like that.
25    Q.  Did you talk specifically about your

Page 145

1  gripes or your claims?
2    A.  Absolutely not.
3    Q.  Are you in possession at this time of any
4  Dubber property as far as laptops, computers,
5  files?
6    A.  No.
7    Q.  Have you given your attorney all the
8  documents that you contend support your claims
9  that you're aware of?
10    A.  I've -- I have given him all the
11  documents that I believe were requested by you,
12  for sure.  I don't know if there's anything else
13  outstanding.
14    Q.  So there aren't documents that you
15  believe support your claim that weren't provided.
16  Is that accurate?
17    A.  Yes.  The journals are not documents,
18  right?
19    Q.  Understood.
20    A.  Okay.
21    Q.  We can take the journal out for a second.
22  Do you still have access to your Dubber
23  internet -- I mean email account?
24    A.  No.
25    Q.  Have you ever tried to access Dubber's

37 (Pages 142 - 145)

Todd Rowan
October 17, 2019
Rowan, Todd Vs. Dubber, Inc.

Page 158

1  be beneficial for the two of you to have a meeting
2  in person to discuss these matters.  If you could
3  advise a suitable time for you I will see if James
4  can lock in that time with you.
5      Q.  And then just look up to the response.
6      A.  My response?
7      Q.  Yes.
8      A.  Thanks for this, Eric.  Regarding the
9  other outstanding items, as I have said I want the
10  responses in writing by COB today or we need to
11  move forward to the next steps which I seek to
12  avoid.
13     Q.  Did you ever reach out to Eric or to
14  James to set up the meeting while James was
15  stateside?
16     A.  So you are missing the whole chain of
17  emails which I can provide.
18     Q.  I understand.  But the question is:  Did
19  you make an attempt to reach out to James to
20  schedule a time to meet with him while he was in
21  the United States?
22     A.  I had no interest with meeting with James
23  based upon my history with the company and my
24  personal history being bullied by James while I
25  was employed with Dubber.  They offered a date for

Page 159

1  me to see James face-to-face.  It was the Friday
2  before Thanksgiving.  I reiterated again that I
3  would not be able to see James at that time.  I
4  forget what the reason was, I might have had a job
5  interview or whatever, and I said at this point in
6  our conversations I would prefer to have Dubber's
7  responses to my three requests in writing.
8      Q.  So is it fair to say that James and
9  Dubber did make an attempt to meet with you after
10  this November 10th email, yes or no?
11     A.  They made an attempt to meet with me but
12  not to respond to my claims.  I have no idea what
13  the meeting was going to be about.
14     Q.  And is that because you did not agree to
15  attend such a meeting?
16     A.  It's because it was never -- I don't know
17  what the meeting was going to be about.  I wanted
18  to know what their stance was before.  And as I
19  said, being in a hostile work environment, more
20  importantly due to the fact I'm no longer employed
21  with them, I saw no reason to meet face-to-face
22  with what could be put into writing.
23     Q.  Thank you.  What are you seeking as a
24  result of this lawsuit?
25     A.  I'm seeking the damages outlined in our

Page 160

1  claim with regards to severance, ESOP and
2  commissions.  I'm also receiving -- interested in
3  receiving my attorneys fees as part of that due to
4  my feeling that Dubber has been stubbornly
5  litigious in this whole process.
6      Q.  Let's quickly go back to the complaint --
7  or, sorry, the interrogatory responses,
8  Defendant's Exhibit 10.
9      A.  Number 10?
10     Q.  Yes, sir.
11     A.  Okay.
12     Q.  And I'll get the right page number this
13  time.  Page 6 of 9, do you see number 7?
14     A.  Correct.
15     Q.  I'll represent because the -- you're
16  welcome to cross-reference in case you don't
17  believe me, but I'll represent to you that this
18  question asks you to identify the category of
19  damages that you seek in this lawsuit.  Is that
20  agreeable?
21     A.  Yes.
22     Q.  Do the enumerated categories 1 through 8
23  accurately reflect the damages that you're seeking
24  here?
25     A.  Yes.

Page 161

1      Q.  Are there any current or former employees
2  of Dubber that you believe will be able to
3  substantiate your claims?
4      A.  Yes.
5      Q.  Who are they?
6      A.  Former would be John Rowe.  Lee Essex.
7  Current, my concern is retaliatory actions based
8  for the company if I'm to name them.
9      Q.  Okay.  So are those people that you would
10  not reach out to if --
11     A.  They're on the list, but I just want that
12  for the record that I'm concerned about
13  retaliatory actions by the company.
14     Q.  Thank you.  The record will so reflect.
15  Will you please identify those employees?
16     A.  Nick Atkin, Yanif Epshtein, Emma Essex,
17  well, James, Adrian, Steve McGovern.  And let me
18  refer to the interrogatories, since I will make
19  sure I don't miss anything since I missed on the
20  oral question, the damages part.
21     Q.  Again, yeah, feel free.  I'm not trying
22  to quiz you.
23     A.  Eric Beylin, sorry about that.  That's
24  why I'm checking.
25     Q.  Perfect.  Maybe a better question:  Is

41 (Pages 158 - 161)

Exhibits

# Commission Calculation

ACCOUNT MANAGER: TODD ROWAN

| | USD - $ |
|---|---|
| Per Single Point | 2500 |

| | | Points | Calculation |
|---|---|---|---|
| Deal | | 1.5 | per Service Provider or Approved deal |
| Committed Revenue | 1250 | 0.15 | per $1250 USD committed monthly revenue, Starting at $1250 |
| Addressable Market | 30000 | 0.1 | per 30,000 users and in 30,000 brackets, Starting at 30,000 |

| | |
|---|---|
| TOTAL PAYABLE | $57,932.92 |
| TOTAL PAID | $30,984.59 |
| TOTAL OUTSTANDING | $25,906.66 |

## CDK

| Service Provider | Yes | Committed Revenue | $21,000.00 | Addressable Market | 200000 | Totals | |
|---|---|---|---|---|---|---|---|
| Amount | $3,750.00 | Amount | $6,300.00 | Amount | $1,666.67 | Total Payable | $11,716.67 |
| Due to Payment | Yes | Revenue Commenced? | Yes | Revenue Commenced? | yes | | |
| Paid | $3,750.00 | Paid | $0.00 | Paid | $0.00 | Paid | $3,750.00 |
| Outstanding | $0.00 | Outstanding | $6,300.00 | Outstanding | $1,666.67 | Outstanding | $7,966.67 |

## AT&T Collaborate

| Service Provider | Yes | Committed Revenue | $0.00 | Addressable Market | 50000 | Totals | |
|---|---|---|---|---|---|---|---|
| Amount | $3,750.00 | Amount | $0.00 | Amount | $416.67 | Total Payable | $4,166.67 |
| Due to Payment | Yes | Revenue Commenced? | Yes | Revenue Commenced? | Yes | | |
| Paid | $3,750.00 | Paid | $0.00 | Paid | $416.67 | Paid | $4,166.67 |
| Outstanding | $0.00 | Outstanding | $0.00 | Outstanding | $0.00 | Outstanding | $0.00 |

## Shaw

| Service Provider | Yes | Committed Revenue | $4,000.00 | Addressable Market | 5000 | Totals | |
|---|---|---|---|---|---|---|---|
| Amount | $3,750.00 | Amount | $1,200.00 | Amount | $41.67 | Total Payable | $4,991.67 |
| Due to Payment | Yes | Revenue Commenced? | Yes | Revenue Commenced? | Yes | | |
| Paid | $3,750.00 | Paid | $1,200.00 | Paid | $41.67 | Paid | $4,991.67 |
| Outstanding | $0.00 | Outstanding | $0.00 | Outstanding | $0.00 | Outstanding | $0.00 |

## ECG

| Service Provider | No | Committed Revenue | $120.00 | Addressable Market | 30 | Totals | |
|---|---|---|---|---|---|---|---|

DEFENDANT'S EXHIBIT 3

PENGAD 800-631-6989



Dubber Production 000100

**(unnamed top block)**

| Service Provider | | Committed Revenue | | Addressable Market | | Totals | |
|---|---|---|---|---|---|---|---|
| Amount | $0.00 | Amount | $36.00 | Amount | $0.25 | Total Payable | $36.25 |
| Due to Payment | Yes | Revenue Commenced? | Yes | Revenue Commenced? | Yes | Paid | $36.25 |
| Paid | $0.00 | Paid | $36.00 | Paid | $0.25 | Outstanding | $0.00 |
| Outstanding | $0.00 | Outstanding | $0.00 | Outstanding | $0.00 | | |

## Teklinks

| Service Provider | Yes | Committed Revenue | | Addressable Market | | Totals | |
|---|---|---|---|---|---|---|---|
| Amount | $3,750.00 | Amount | $0.00 | Amount | 5000 | Total Payable | $3,791.67 |
| Due to Payment | Yes | Revenue Commenced? | No | Revenue Commenced? | No | Paid | $3,750.00 |
| Paid | $3,750.00 | Paid | $0.00 | Paid | $41.67 | Outstanding | $0.00 |
| Outstanding | $0.00 | Outstanding | $0.00 | Outstanding | $0.00 | | |

## Megapath

| Service Provider | Yes | Committed Revenue | | Addressable Market | | Totals | |
|---|---|---|---|---|---|---|---|
| Amount | $3,750.00 | Amount | $1,800.00 | Amount | 90000 | Total Payable | $5,040.00 |
| Due to Payment | Yes | Revenue Commenced? | Yes | Revenue Commenced? | Yes | Paid | $5,040.00 |
| Paid | $3,750.00 | Paid | $540.00 | Paid | $750.00 | Outstanding | $0.00 |
| Outstanding | $0.00 | Outstanding | $0.00 | Outstanding | $0.00 | | |

## Bell.ca

| Service Provider | Yes | Committed Revenue | | Addressable Market | | Totals | |
|---|---|---|---|---|---|---|---|
| Amount | $3,750.00 | Amount | $5,000.00 | Amount | 100000 | Total Payable | $6,083.33 |
| Due to Payment | Yes | Revenue Commenced? | Yes | Revenue Commenced? | Yes | Paid | $0.00 |
| Paid | $0.00 | Paid | $1,500.00 | Paid | $833.33 | Outstanding | $6,083.33 |
| Outstanding | $3,750.00 | Outstanding | $1,500.00 | Outstanding | $833.33 | | |

## Cox

| Service Provider | Yes | Committed Revenue | | Addressable Market | | Totals | |
|---|---|---|---|---|---|---|---|
| Amount | $3,750.00 | Amount | $0.00 | Amount | 120000 | Total Payable | $4,750.00 |
| Due to Payment | Yes | Revenue Commenced? | No | Revenue Commenced? | No | Paid | $1,000.00 |
| Paid | $3,750.00 | Paid | $0.00 | Paid | $1,000.00 | Outstanding | $0.00 |
| Outstanding | $0.00 | Outstanding | $0.00 | Outstanding | $0.00 | | |

## Telehop

| Service Provider | Yes | Committed Revenue | | Addressable Market | | Totals | |
|---|---|---|---|---|---|---|---|
| Amount | $3,750.00 | Amount | $300.00 | Amount | 0 | Total Payable | $3,840.00 |
| Due to Payment | Yes | Revenue Commenced? | Yes | Revenue Commenced? | Yes | Paid | $0.00 |
| Paid | $3,750.00 | Paid | $90.00 | Paid | $90.00 | Outstanding | $3,840.00 |
| Outstanding | $0.00 | Outstanding | $90.00 | Outstanding | $0.00 | | |

## Mettel

| Service Provider | Yes | Committed Revenue | $5,000.00 | Addressable Market | 30000 | Totals | $5,500.00 |
|---|---|---|---|---|---|---|---|
| Amount | $3,750.00 | Amount | $1,500.00 | Amount | $250.00 | Total Payable | |
| Due to Payment | Yes | Revenue Commenced? | Yes | Revenue Commenced? | Yes | | |
| Paid | $3,750.00 | Paid | $1,500.00 | Paid | $250.00 | Paid | $5,500.00 |
| Outstanding | $0.00 | Outstanding | $0.00 | Outstanding | $0.00 | Outstanding | $0.00 |

**CBTS**

| Service Provider | Yes | Committed Revenue | $12,000.00 | Addressable Market | 80,000 | Totals | $8,016.67 |
|---|---|---|---|---|---|---|---|
| Amount | $3,750.00 | Amount | $3,600.00 | Amount | $666.67 | Total Payable | |
| Due to Payment | Yes | Revenue Commenced? | Yes | Revenue Commenced? | Yes | | |
| Paid | $0.00 | Paid | $0.00 | Paid | $0.00 | Paid | $0.00 |
| Outstanding | $3,750.00 | Outstanding | $3,600.00 | Outstanding | $666.67 | Outstanding | $8,016.67 |

Dubber Production 000102

Dubber Production 000103

# Commission Calculation

SALES MANAGER:   TODD ROWAN

| TOTAL PAYABLE | $17,102.88 |
|---|---|
| TOTAL PAID | $9,295.38 |
| TOTAL OUTSTANDING | $6,370.00 |

| | USD - $ |
|---|---|
| Per Single Point | 750 |

| | | Points | Calculation |
|---|---|---|---|
| Deal | | 1.5 | per Service Provider or Approved deal |
| Committed Revenue | 1250 | 0.15 | per $1250 USD committed monthly revenue. Starting at $1250 |
| Addressable Market | 30000 | 0.1 | per 30,000 users and in 30,000 brackets. Starting at 30,000 |

## CDK

| Service Provider | Yes | Committed Revenue | $21,000.00 | Addressable Market | 200000 | Totals | |
|---|---|---|---|---|---|---|---|
| Amount | $1,125.00 | Amount | $1,890.00 | Amount | $500.00 | Total Payable | $3,515.00 |
| Due to Payment | Yes | Revenue Commenced? | Yes | Revenue Commenced? | yes | | |
| Paid | $1,125.00 | Paid | $0.00 | Paid | $0.00 | Paid | $1,125.00 |
| Outstanding | $0.00 | Outstanding | $1,890.00 | Outstanding | $500.00 | Outstanding | $2,390.00 |

## AT&T Collaborate

| Service Provider | Yes | Committed Revenue | $0.00 | Addressable Market | 50000 | Totals | |
|---|---|---|---|---|---|---|---|
| Amount | $1,125.00 | Amount | $0.00 | Amount | $125.00 | Total Payable | $1,250.00 |
| Due to Payment | Yes | Revenue Commenced? | Yes | Revenue Commenced? | Yes | | |
| Paid | $1,125.00 | Paid | $0.00 | Paid | $125.00 | Paid | $1,250.00 |
| Outstanding | $0.00 | Outstanding | $0.00 | Outstanding | $0.00 | Outstanding | $0.00 |

## Shaw

| Service Provider | Yes | Committed Revenue | $4,000.00 | Addressable Market | 5000 | Totals | |
|---|---|---|---|---|---|---|---|
| Amount | $1,125.00 | Amount | $360.00 | Amount | $12.50 | Total Payable | $1,497.50 |
| Due to Payment | Yes | Revenue Commenced? | Yes | Revenue Commenced? | Yes | | |
| Paid | $1,125.00 | Paid | $360.00 | Paid | $12.50 | Paid | $1,497.50 |
| Outstanding | $0.00 | Outstanding | $0.00 | Outstanding | $0.00 | Outstanding | $0.00 |

## ECG

| Service Provider | No | Committed Revenue | $120.00 | Addressable Market | 30 | Totals |
|---|---|---|---|---|---|---|

Dubber Production 000104

| Category | Amount / Metric | Revenue Commenced? / Due to Payment | Paid | Outstanding |
|---|---|---|---|---|
| **(Summary)** | | | | |
| Service Provider | $0.00 | Yes (Due to Payment) | $0.00 | $0.00 |
| Committed Revenue | $10.80 | Yes | $10.80 | $0.00 |
| Addressable Market | $0.08 | Yes | $0.08 | $0.00 |
| Totals — Total Payable | $10.88 | Yes | $10.88 | $0.00 |

### Teklinks

| Category | Amount / Metric | Revenue Commenced? / Due to Payment | Paid | Outstanding |
|---|---|---|---|---|
| Service Provider | $1,125.00 | Yes (Due to Payment) | $1,125.00 | $0.00 |
| Committed Revenue | $1,125.00 | Yes | $1,125.00 | $0.00 |
| Addressable Market | 5000 / $12.50 | No | $0.00 | $0.00 |
| Totals — Total Payable | $1,137.50 | Yes | $1,125.00 | $0.00 |

### Megapath

| Category | Amount / Metric | Revenue Commenced? / Due to Payment | Paid | Outstanding |
|---|---|---|---|---|
| Service Provider | $1,125.00 | Yes (Due to Payment) | $1,125.00 | $0.00 |
| Committed Revenue | $1,800.00 | Yes | $162.00 | $0.00 |
| Addressable Market | 90000 / $225.00 | No | $225.00 | $0.00 |
| Totals — Total Payable | $1,512.00 | Yes | $1,512.00 | $0.00 |

### Loud & Clear

| Category | Amount / Metric | Revenue Commenced? / Due to Payment | Paid | Outstanding |
|---|---|---|---|---|
| Service Provider | $1,125.00 | Yes (Due to Payment) | $1,125.00 | $0.00 |
| Committed Revenue | $0.00 | No | $0.00 | $0.00 |
| Addressable Market | 0 | No | $0.00 | $0.00 |
| Totals — Total Payable | $1,125.00 | Yes | $50.00 | $0.00 |

### Cox

| Category | Amount / Metric | Revenue Commenced? / Due to Payment | Paid | Outstanding |
|---|---|---|---|---|
| Service Provider | $1,125.00 | Yes (Due to Payment) | $1,125.00 | $0.00 |
| Committed Revenue | $5,000.00 | Yes | $450.00 | $0.00 |
| Addressable Market | 120000 / $300.00 | No | $0.00 | $0.00 |
| Totals — Total Payable | $1,425.00 | No | $1,125.00 | $0.00 |

### Mettel

| Category | Amount / Metric | Revenue Commenced? / Due to Payment | Paid | Outstanding |
|---|---|---|---|---|
| Service Provider | $1,125.00 | Yes (Due to Payment) | $1,125.00 | $0.00 |
| Committed Revenue | $5,000.00 | Yes | $450.00 | $0.00 |
| Addressable Market | 30000 / $75.00 | No | $75.00 | $0.00 |
| Totals — Total Payable | $1,650.00 | No | $1,125.00 | $0.00 |

### CBTS

Dubber Production 000105

| Service Provider | Yes | Committed Revenue | $5,000.00 | Addressable Market | 80000 | Totals | |
|---|---|---|---|---|---|---|---|
| Amount | $1,125.00 | Amount | $450.00 | Amount | $200.00 | Total Payable | $1,775.00 |
| Due to Payment | Yes | Revenue Commenced? | Yes | Revenue Commenced? | Yes | | |
| Paid | $0.00 | Paid | $0.00 | Paid | $0.00 | Paid | $0.00 |
| Outstanding | $1,125.00 | Outstanding | $450.00 | Outstanding | $200.00 | Outstanding | $1,775.00 |

**Bell.ca**

| Service Provider | Yes | Committed Revenue | $12,000.00 | Addressable Market | 0 | Totals | |
|---|---|---|---|---|---|---|---|
| Amount | $1,125.00 | Amount | $1,080.00 | Amount | $0.00 | Total Payable | $2,205.00 |
| Due to Payment | Yes | Revenue Commenced? | Yes | Revenue Commenced? | No | | |
| Paid | $0.00 | Paid | $0.00 | Paid | $0.00 | Paid | $0.00 |
| Outstanding | $1,125.00 | Outstanding | $1,080.00 | Outstanding | $0.00 | Outstanding | $2,205.00 |

**From:** Todd Rowan <todd@trowan.com>
**Sent:** Thursday, March 30, 2017 11:45 AM
**To:** 'John Butler' <john.butler@searchlogixgroup.com>
**Subject:** RE: Todd Rowan

Thanks

**From:** John Butler [mailto:john.butler@searchlogixgroup.com]
**Sent:** Thursday, March 30, 2017 11:38 AM
**To:** todd@trowan.com
**Subject:** FW: Todd Rowan

FYI

**John Butler, SPHR---**
Vice President
The SearchLogix Group
Office:  910-294-0406
Cell:  404-229-9425
john.butler@searchlogixgroup.com
http://www.linkedin.com/in/johnbutlerrecruiter
www.searchlogixgroup.com

---

**From:** John Butler
**Sent:** Thursday, March 30, 2017 11:17 AM
**To:** 'James Slaney'
**Subject:** RE: Todd Rowan

James

Here are the items you add in the contract or offer letter.

Sick days:  5

Vacation:  Normally for a senior executive its 4 weeks.

Holidays:  You will be paid for 10 holidays in the US.  They include New Year's Day, Memorial Day, July 4th, Labor day, Thanksgiving, Day after Thanksgiving and Christmas Day, President's day, Martin Luther King Birthday, and Columbus Day.

Page 1 of 4

Remember longer term (with next 60-90 days)  you will need to provide a retirement plan, life insurance and short and long term disability insurance.  These items will also be critical to hire additional people because they will expect it.

Regards,,

**John Butler, SPHR---**
Vice President
The SearchLogix Group
Office:  910-294-0406
Cell:  404-229-9425
john.butler@searchlogixgroup.com
http://www.linkedin.com/in/johnbutlerrecruiter
www.searchlogixgroup.com

**From:** James Slaney [mailto:james@dubber.net]
**Sent:** Thursday, March 30, 2017 11:05 AM
**To:** John Butler
**Subject:** Re: Todd Rowan

Europe might be hard for him. I've made the change.

Todd and I have discuss team and I don't think we need to document, as we're on the same page about growth requirements.

$180k was the last discussion.

Sick leave, whatever is standard, but I'm sure this will be in contract.
Holidays, i was under the impression this is 2 weeks per year. Is this not the case?
Public Holidays, all which apply for him in Atlanta is normal

i'll wait for your response and then make changes.

10th looks like the best day to start. I'll get his computer and everything shipped to his home and we'll arrange WeWork access in Atlanta for him, if he likes.

First week will be all travel within States, but I'll speak to him about this.

Thanks,

**James Slaney** | Co-founder | Dubber
james@dubber.net | London +44 7899 752296 |
@dubberapp | linkedin.com/in/jamesslaney

On 30 March 2017 at 14:44, John Butler <john.butler@searchlogixgroup.com> wrote:
Looks good

I see you want him to run the sales team in Europe correct?  How many people are we talking about?

Also, I think you and Todd have been talking about a Base Salary of $185,000 can you get to that number?

Dubber Production 000107

Insurance and cell phone looks good.

Severance looks good.

How do you want to handle vacation, holidays, sick time, etc.

Sales commissions look good, I am assuming you can show him how he can make the numbers.

Let me know your thoughts.

Regards,

**John Butler, SPHR---**
Vice President
The SearchLogix Group
Office: 910-294-0406
Cell: 404-229-9425
john.butler@searchlogixgroup.com
http://www.linkedin.com/in/johnbutlerrecruiter
www.searchlogixgroup.com

**From:** James Slaney [mailto:james@dubber.net]
**Sent:** Thursday, March 30, 2017 9:36 AM
**To:** John Butler
**Subject:** Re: Todd Rowan

Hi John,

Draft letter of offer attached.

Can you provide feedback?

I am to get this to Todd today.

Start date, I'm working out today and hope to have this decided on in next few hours.

Thanks,

**James Slaney** | Co-founder | Dubber
james@dubber.net | London +44 7899 752296 |
@dubberapp | linkedin.com/in/jamesslaney

On 30 March 2017 at 11:01, John Butler <john.butler@searchlogixgroup.com> wrote:
James

Just checking.

Have you had time to complete Todd's offer letter.

I know you had a packed schedule yesterday.

**Page 3 of 4**

Dubber Production 000108

Regards,

**John Butler, SPHR**
Vice President
The SearchLogix Group
2950 Cherokee Street
Bldg. 1000
Kennesaw, GA  30144

"We Build Better Companies"

Office:  910-294-0406
Cell:  404-229-9425
john.butler@searchlogixgroup.com
http://www.linkedin.com/in/johnbutlerrecruiter
www.searchlogixgroup.com
www.thedailyrecruiter.com
@advicefromarecruiter

**Page 4 of 4**

Dubber Production 000109

**From:** James Slaney <james@dubber.net>
**Sent:** Tuesday, April 4, 2017 10:44 AM
**To:** Todd Rowan <todd@trowan.com>
**Subject:** Re: Couple of Hurdles

Couple of ways. As the Sales VP, this is how we view it for you.

1. If you close a deal yourself, you earn the BDM commission on new deals. (See attachment, tab BDM)
2. As the manager, you also get the override commission on new deals. (See attachment, tab SM Override)
3. You also earn a percentage of the monthly revenue increase within this quarter of 25%. E.g. Regional billing increases by $100,000 monthly, you get $25,000.

Also attached is a example of the RoutIT deal in The Netherlands, which is currently going live. This is what the BDM and manager would earn on that deal.

We can go over the commission structure when we meet, but this is where my head is at today.

Let me know your thoughts.

Thanks,

**James Slaney** | Co-founder | Dubber
james@dubber.net | London +44 7899 752296 |
@dubberapp | linkedin.com/in/jamesslaney

On 4 April 2017 at 15:20, Todd Rowan <todd@trowan.com> wrote:

This makes sense from MBO perspective but how could I earn 100% commission for quarter?

Thank you,

Todd C Rowan

+1 954 740 9467

On Apr 4, 2017, at 10:03 AM, James Slaney <james@dubber.net> wrote:

Hi mate,

I've had a chat with Steve and what to put forward the below structure concept. I knows whats currently happening and I'm trying to ignore deal status.

Dubber Production 000110

---

Q1 Objectives
Begin direct communication with Key prospects:

- AT&T - New Jersey
- Cox - Atlanta
- MetaSwitch - Dallas
- CDK - Portland
- EvolveIP - Philadelphia
- Shaw Communications - Calgary Canada
- Note: Prospect list is much larger, but this is the key prospects.

Begin direct communication with Dubber partners:

- ECG - potential distribution/referral partner - Georgia
- Mark Bing - BroadSoft AM for AT&T
- Russell Sanders - BroadSoft (AVP MSO Sale) - Introducer to Cox
- Jean-Francois Pharand - Oxilio - Dubber Partner in Canada (focussed on Bell Canada)

Deals:

- Close 1 'deal' in first quarter.
  - 
    - Deal deffination: A Service Provider or Partner who signs an agreement with Dubber, allowing  Dubber the ability to announce to our Investor market (note: The ability to announce is the requirement, not the release of the announcement.)
    - Agreement definition:
      - 
        - Service Provider signs a Master Service Agreement, with or without a financial commitment. E.g. EvolveIP agreeing to connect to Dubber and begin offering Dubber as a premium recording service.
        - Service Provider signs a Channel Partner Agreement (or similar), limited to AT&T and Cox.
        - Partnering or Resell Agreement with MetaSwitch, ECG or others as approved during the quarter.

**Achievement of above results in 50% of quarter commission = $15,000**
No limit on commission within quarter. Commission will be calculated for quarter based on standard (to be agreed structure) commission structure for Todd Rowan. Additional commission will be due once it exceeds the $15,000.

---

Let me summarise why I think this is possible:
1. Nick and I aim to get you in touch with all contacts within first 3 weeks, hopefully meeting all in person.
2. AT&T and Cox are committed to go live by July.

Dubber Production 000111

3. EvolveIP have verbally said they'll go live and allow Dubber to announce the deal.
4. The pipeline in the States is much larger, we also have 2 small deals which are expected to close this month, which i believe we'll announce if done this month.

Happy to discuss and get your thoughts.

Thanks,

**James Slaney** | Co-founder | Dubber
james@dubber.net | London +44 7899 752296 |
@dubberapp | linkedin.com/in/jamesslaney

On 3 April 2017 at 17:12, Todd Rowan <todd@trowan.com> wrote:

> Ok. I'm sure we will get there
>
> Thank you,
>
> Todd C Rowan
>
> +1 954 740 9467
>
> On Apr 3, 2017, at 12:05 PM, James Slaney <james@dubber.net> wrote:
>
>> I've got a few ideas, working on them now. I need to document and send to you and Steve, so we're all on the page.
>>
>> Thanks,
>>
>> **James Slaney** | Co-founder | Dubber
>> james@dubber.net | London +44 7899 752296 |
>> @dubberapp | linkedin.com/in/jamesslaney
>>
>> On 3 April 2017 at 16:20, Todd Rowan <todd@trowan.com> wrote:
>>
>>> Ok. Let's make this simple. I trust the comp plan will be fair and equitable. So I'm not going to negotiate it as part of an offer. So let's just stick with the guarantee. Thoughts?
>>>
>>> Thank you,
>>>
>>> Todd C Rowan
>>>
>>> +1 954 740 9467
>>>
>>> On Apr 3, 2017, at 11:16 AM, James Slaney <james@dubber.net> wrote:
>>>
>>>> Great on point 1. Didn't think that would be a problem.

Page 3 of 5

Dubber Production 000112

Point 2. I want to get this done tonight, can I ask you to be clear as to the timeline and structure of MBOs? If you want me to run with something instead, then I think we might be a couple of days from getting this finalised.

Thanks heaps,

**James Slaney** | Co-founder | Dubber
james@dubber.net | London +44 7899 752296 |
@dubberapp | linkedin.com/in/jamesslaney

On 3 April 2017 at 16:07, Todd Rowan <todd@trowan.com> wrote:

> Point one is fine. On point 2 i can be somewhat flexible. I think we are in agreement as to what i am looking for.  How about shorter guarantee then MBOs?
>
> Thank you,
>
> Todd C Rowan
>
> +1 954 740 9467
>
> On Apr 3, 2017, at 10:56 AM, James Slaney <james@dubber.net> wrote:
>
>> Hi mate,
>>
>> **Point 1: Contracting 2 Months**
>>
>> I've been working on getting your employment agreement, but I've got a delay.
>>
>> Our customers in the States are currently contracted to Dubber in Australia. Dubber is incorporated in the UK and I thought this was completed in the USA, but I'm now told this is in process and still 6 to 8 weeks away. The delay is because all representatives within Dubber Inc do not have a US social security number. This means, the whole process is manual.
>>
>> i need to ask you something. I can get you an employment agreement, but this cannot take effect until the FID number

Page 4 of 5

Dubber Production 000113

is available. In the interim, do you mind contracting to Dubber for potentially 2 months at the longest?

My understanding is that we'll pay your the full rate (no tax with held) and compensate you for social security (I'm getting confirmation on the figure). All other details are as per agreed.

### Point 2: Guaranteed Commission

I've got a level of push back from Steve and I'm still working this through with him. Guaranteed at the levels is the problem. Happy to talk again, but what are your thoughts? He's currently sleeping, so won't be able to get it finalised until my morning tomorrow with him.

Call if you want.

Thanks,

**James Slaney** | Co-founder | Dubber
james@dubber.net | London +44 7899 752296 |
@dubberapp | linkedin.com/in/jamesslaney

Dubber Production 000114

**From:** James Slaney <james@dubber.net>
**Sent:** Tuesday, April 4, 2017 2:34 PM
**To:** Todd Rowan <todd@trowan.com>
**Subject:** Re: Couple of Hurdles

15k MBO & 15k Comp is the deal.

I'll put this in the offer letter tonight. If you can sign and get it back to me by tomorrow your time.

There is also a form I need completed so you can be a sub contractor for the first 2 months, plus a IP ownership document, which I'll get from Australia tonight.

Welcome aboard mate.

**James Slaney** | Co-founder | Dubber
james@dubber.net | London +44 7899 752296 |
@dubberapp | linkedin.com/in/jamesslaney

On 4 April 2017 at 19:19, Todd Rowan <todd@trowan.com> wrote:

> I think we are good. So to be clear, I am not in a situation where to earn the 30k for q1 I actually need 45k. 45k-15kmbo.
>
> If it's 15k mbo plus 15k comp plan as laid out. Then let's get stuff signed and move ahead.
>
> Thanks
>
> Thank you,
>
> Todd C Rowan
>
> +1 954 740 9467
>
> On Apr 4, 2017, at 2:13 PM, James Slaney <james@dubber.net> wrote:
>
>> Your correct on the commission question.
>>
>> All current deals, you'll get the credit in relation to commission, except:
>>
>> - EPB in Tenessee. This is currently owned by the our rep in the UK. He's managed the whole process.
>> - Novalink in NY. As per above.

**Page 1 of 43**

Dubber Production 000115

- Bell Canada - This is debatable, but worst case, you would get override or hit your minimum deal for the first qrt. (I think this will not fall this qrt and you'll take over the opportunity moving forward)

Outside that, everything is yours.

I'm aiming to get a few of these deals across the line this qrt.

Any additional questions? Happy to talk.

Thanks,

**James Slaney** | Co-founder | Dubber
james@dubber.net | London +44 7899 752296 |
@dubberapp | linkedin.com/in/jamesslaney

On 4 April 2017 at 18:15, Todd Rowan <todd@trowan.com> wrote:

> Ok
>
> Thank you,
>
> Todd C Rowan
>
> +1 954 740 9467
>
> On Apr 4, 2017, at 12:47 PM, James Slaney <james@dubber.net> wrote:
>
>> Hi, I'm about to get on the tube and will be home in about 45mins. I'll try to contact you then, so we can get this clear.
>>
>> Thanks,
>>
>> **James Slaney** | Co-founder | Dubber
>> james@dubber.net | London +44 7899 752296 |
>> @dubberapp | linkedin.com/in/jamesslaney
>>
>> On 4 April 2017 at 17:13, Todd Rowan <todd@trowan.com> wrote:
>>
>>> Are there any current deals working that I will NOT get credit for?  ATT? Cox?
>>>
>>> Thank you,
>>>
>>> Todd C Rowan
>>>
>>> +1 954 740 9467
>>>
>>> On Apr 4, 2017, at 11:52 AM, James Slaney <james@dubber.net> wrote:
>>>
>>>> no problem. i've got a couple of calls for the next hour.

Dubber Production 000116

**James Slaney** | Co-founder | Dubber
james@dubber.net | London +44 7899 752296 |
@dubberapp | linkedin.com/in/jamesslaney

On 4 April 2017 at 16:15, Todd Rowan <todd@trowan.com>
wrote:

> Let me look over when I get back to hotel. 45 mins
>
> Thank you,
>
> Todd C Rowan
>
> +1 954 740 9467
>
> On Apr 4, 2017, at 10:50 AM, James Slaney
> <james@dubber.net> wrote:
>
>> Sorry, I forgot to mention for the
>> example.
>>
>> RoutIT is starting with $6000 per month
>> in billing, but has 350,000 users.
>>
>> **James Slaney** | Co-founder | Dubber
>> james@dubber.net | London +44 7899 752296 |
>> @dubberapp | linkedin.com/in/jamesslaney
>>
>> On 4 April 2017 at 15:43, James Slaney
>> <james@dubber.net> wrote:
>>
>>> Couple of ways. As the Sales VP, this
>>> is how we view it for you.
>>>
>>> 1. If you close a deal yourself, you
>>>    earn the BDM commission on new
>>>    deals. (See attachment, tab BDM)
>>> 2. As the manager, you also get the
>>>    override commission on new
>>>    deals. (See attachment, tab SM
>>>    Override)
>>> 3. You also earn a percentage of the
>>>    monthly revenue increase within
>>>    this quarter of 25%. E.g. Regional
>>>    billing increases by $100,000
>>>    monthly, you get $25,000.
>>>
>>> Also attached is a example of the RoutIT
>>> deal in The Netherlands, which is
>>> currently going live. This is what the
>>> BDM and manager would earn on that
>>> deal.

Dubber Production 000117

We can go over the commission structure when we meet, but this is where my head is at today.

Let me know your thoughts.

Thanks,

**James Slaney** | Co-founder | Dubber
james@dubber.net | London +44 7899 752296 |
@dubberapp | linkedin.com/in/jamesslaney

On 4 April 2017 at 15:20, Todd Rowan
<todd@trowan.com> wrote:

> This makes sense from MBO perspective but how could I earn 100% commission for quarter?
>
> Thank you,
>
> Todd C Rowan
>
> +1 954 740 9467
>
> On Apr 4, 2017, at 10:03 AM, James Slaney <james@dubber.net> wrote:
>
>> Hi mate,
>>
>> I've had a chat with Steve and what to put forward the below structure concept. I know whats currently happening and I'm trying to ignore deal status.
>>
>> ---
>>
>> Q1 Objectives
>> Begin direct communication with Key prospects:
>>
>> - AT&T - New Jersey
>> - Cox - Atlanta
>> - MetaSwitch - Dallas

Page 4 of 43

- CDK - Portland
- EvolveIP - Philadelphia
- Shaw Communications - Calgary Canada
- Note: Prospect list is much larger, but this is the key prospects.

Begin direct communication with Dubber partners:

- ECG - potential distribution/referral partner - Georgia
- Mark Bing - BroadSoft AM for AT&T
- Russell Sanders - BroadSoft (AVP MSO Sale) - Introducer to Cox
- Jean-Francois Pharand - Oxilio - Dubber Partner in Canada (focussed on Bell Canada)

Deals:

- Close 1 'deal' in first quarter.
  - •
    - Deal deffination: A Service Provider or Partner who signs an agreement with Dubber, allowing Dubber the ability to announce to our Investor market (note: The ability to announce is

Dubber Production 000119

the
requirement,
not the
release of
the
announceme
nt.)
- Agreement
  definition:
    - ○
      - Service
        Provide
        r signs
        a
        Master
        Service
        Agree
        ment,
        with or
        without
        a
        financi
        al
        commit
        ment.
        E.g.
        EvolveI
        P
        agreein
        g to
        connec
        t to
        Dubber
        and
        begin
        offering
        Dubber
        as a
        premiu
        m
        recordi
        ng serv
        ice.
      - Service
        Provide
        r signs
        a
        Chann
        el
        Partner

Dubber Production 000120

---------- Forwarded message ---------
From: James Slaney <james@dubber.net>
Date: Thu, Jun 14, 2018 at 8:31 AM
Subject: Re: Commissions
To: Eric Beylin <ericb@dubber.net>
CC: Todd Rowan <todd.rowan@dubber.net>


Let me start by saying that in the future, Todd you will need to do you own Commission report.
If the report doesn't work on your computer, you will need to replicate and submit.

See points as per below:

**Page 1 of 6**

Dubber Production 000121

2. Telehop/Iroam was our first Canadian provider, they signed 9.21.2017 and was not previously paid.  I have added to my spreadsheet.
Response: Not sure how your measuring a sale, but its clear in the commission rules I originally provided which show why this deal does not classify as an SP deal, as per below:

Deal

  A Service Provider that has Investor market benefit via an announcement.

  Not all Service Providers will be announced, but can be approved as a Deal by Direct manager during sales process.

3. ATT addressable market- there is no way this is 50K users.  150k is an extremely low amount and aligns with internal ATT discussions and forecasts.  It appears a 1 was deleted I have adjusted.
This was confirmed by Joe. I've also had numbers provided to me that are 20,000. If you can find a previous email stating a higher number, please provide.

4. Shaw- Addressable market is over 5k, per our conversations with customers its around 50k
This number was confirmed during the negotiation process. Again, if you have previous email stating higher, please provide.

5. Mettel- Addressable market is more around 90k vs 30k per conversations, migration, and run rate.
I personally confirmed 30,000 Users when I attended their office in New York.

ATT & Cox Revenues:
Stated in Commission Structure:

Committed Revenue

  On the date of singing, the amount of revneue contracted to Dubber.

  This revenue must commence within 3 months from date of Go Live with Dubber.

If you think this is not clear, I ask you who actually sold the ATT and Cox charges. Do you believe you are 100% due the commission on these payments?

If you feel your being short changed out of this commission, you shouldn't. All commission going forward is based on Revenue Growth, so any growth in revenue will fill what you believe potentially short on your expectations.

I don't have further time to discuss prior to my leave, but we can lock in a time now for my return.

Thanks,

**James Slaney** | Founder | Dubber
james@dubber.net | P +442038843818 | M +44 7899 752296
@jameslaney | linkedin.com/in/jameslaney

On Thu, 14 Jun 2018 at 13:08, Eric Beylin <ericb@dubber.net> wrote:

Dubber Production 000122

Hi Todd,

No it wasn't included in November comms.

Telehop went live in Dec-17, and only have a dozen or so customers on thus far, which means we are unable to get any real revenue from them due to the 2k free tier that was agreed with them.

At this rate, we will not see any revenue from them until Dec 2018 when the free tier expires, and then its only $50 per month of revenue if nothing else changes from them.

Not sure how this scenario is being treated, but leave that up to you and James to discuss.

Cheers,

Eric

On 14 June 2018 at 20:37, Todd Rowan <todd.rowan@dubber.net> wrote:

> Thanks Eric. Can you also confirm that Telahop/ Iroam was not included in the nov commission. My records show it wasn't. Thanks
>
> On Wed, Jun 13, 2018 at 9:56 PM Eric Beylin <ericb@dubber.net> wrote:
>
>> Hi Todd,
>>
>> In regards to the amount paid the other day, when you first sent the email the other day about only being paid 15k, I assumed this was the Net amount paid of 20k gross.
>>
>> I did in fact request the full amount (20k) for both AM/SM to be paid (in the body of my email instruction to him), however, I think John has only looked at the AM tab of the workbook I sent him when actually processing the payment.
>> I have just emailed John to confirm this is what happened, and if so, instructed him to pay the SM amount today.
>>
>> In regards to points 2 - 5, plus further comms owing, this will clearly need further discussions between James, Steve, and yourself.
>>
>> I just wanted to cover off point 1 for you immediately.
>>
>> Cheers,
>>
>> Eric
>>
>>
>>
>> On 14 June 2018 at 11:37, Todd Rowan <todd.rowan@dubber.net> wrote:

Thanks for this.  Couple of things missing that needs to be addressed. Starting with larger impacts first....

1. I was not paid commission on the SM Tab in this workbook per my comp plan. So that commission is due.  You only paid on the AM tab calculations.
2. Telehop/Iroam was our first Canadian provider, they signed 9.21.2017 and was not previously paid.  I have added to my spreadsheet.
3. ATT addressable market- there is no way this is 50K users.  150k is an extremely low amount and aligns with internal ATT discussions and forecasts.  It appears a 1 was deleted I have adjusted.
4. Shaw- Addressable market is over 5k, per our conversations with customers its around 50k
5. Mettel- Addressable market is more around 90k vs 30k per conversations, migration, and run rate.

Lastly, for the record, I completely disagree with the decision to not pay on ATT and Cox revenue.  It is not "committed revenue" it is "paid revenue" in our bank account.  We proposed paying based on one month of this which is how Dubber recognizes revenue.  Also, James had previously approved.  I ask that Dubber reconsider this decision.  Since it is currently a "no" I did not adjust the attached spreadsheet.

Either way, further payment is owed. I am happy to hop on a call to discuss the attached spreadsheet.  Otherwise, can we agree final amount and commit to pay out on June 30 latest.  I want to move forward.

Thanks

Todd

On Wed, Jun 13, 2018 at 10:07 AM, James Slaney <james@dubber.net> wrote:

all figures contained.

- removal of commission for non committed revenues from ATT and Cox
- reduction in megapath UC base

James Slaney | Founder | Dubber
james@dubber.net | P +442038843818 | M +44 7899 752296
@jameslaney | linkedin.com/in/jameslaney

On Wed, 13 Jun 2018 at 15:04, Todd Rowan <todd.rowan@dubber.net> wrote:

Please let me know when I can expect an update on commissions.  Thanks
---------- Forwarded message ----------
From: **Todd Rowan** <todd.rowan@dubber.net>
Date: Mon, Jun 11, 2018 at 8:24 AM
Subject: Commissions
To: Eric Beylin <ericb@dubber.net>, James Slaney <james@dubber.net>

Dubber Production 000124

James, I received my commissions but they were $15948.33.  This is significantly less than what you told me it would be and what we have calculated based on my compensation plan.

When can I expect the rest?

Let me know.

Thank you.


--
Thank you,

Todd Rowan
SVP Americas Dubber Inc

+1 954 740 9467
Todd.Rowan@dubber.net
--
Thank you,

Todd Rowan
SVP Americas Dubber Inc

+1 954 740 9467
Todd.Rowan@dubber.net


--
Thank you,

Todd Rowan
SVP Americas Dubber Inc

+1 954 740 9467
Todd.Rowan@dubber.net


--
Thank you,

Todd Rowan
SVP Americas Dubber Inc

+1 954 740 9467
Todd.Rowan@dubber.net

Page 5 of 6

--
**Eric Beylin** | Dubber - Call Recording as a Service
+61 402 145 867 | +61 3 9998 7903 | ericb@dubber.net

Dubber Corporation Ltd | Melbourne, Australia | **ASX: DUB**

--
Thank you,

Todd Rowan
SVP Americas Dubber Inc

+1 954 740 9467
Todd.Rowan@dubber.net

--
**Eric Beylin** | Dubber - Call Recording as a Service
+61 402 145 867 | +61 3 9998 7903 | ericb@dubber.net

Dubber Corporation Ltd | Melbourne, Australia | **ASX: DUB**

--
Thank you,

Todd Rowan
SVP Americas Dubber Inc

+1 954 740 9467
Todd.Rowan@dubber.net

Dubber Production 000126



# Join the Team....

We're extremely pleased to offer you a role in Dubber. Dubber is changing the way Service Providers across the globe view recording.

## Todd Rowan
VP Sales

**Summary of Responsibilities:**
In line with the Dubber strategic objectives, develop the American region via engagement with Customers, Partners and related parties, managing team growth as needed and achieving agreed targets.

**Key Responsibilities:**
- Manage the regional team to exceed revenue targets and maximize the profit generated for the business.
- Engender a sense of empowerment within the sales team, whilst ensuring sales staff are accountable with clearly defined sales and relationship goals.
- Identify and implement process to manage the customer's perception of the business relationship with Dubber.
- Develop your own relationships with key customers to assist the delivery/ development of sales solutions and customer perception, ensuring that relationships continue in strategic accounts regardless of account ownership.
- Work with your management and product owners/managers to identify, prioritise sell and delegate the sale of current and new products.
- Liaising with your management to identify, manage and allocate sales resource for all customers efficiently.
- Produce, procure and populate monthly, annual reports, statistics and data as required to maximize sales and performance.
- Oversee the administrative maintenance of all key accounts, including, but not limited to; up to date CRM analysis, client history, bookings, lead generation and revenue opportunities.
- Carry out a continuous review of the sales process in order to deliver the most effective selling techniques and to ensure that all sales staff adhere to and deliver a coherent message to all customers.
- Have a strong awareness of; the marketplace, latest technology, price sensitivity and competitive threats.
- Create a structure for constant lead generation and the growth of new key accounts.
- Oversee the production or where applicable, produce business justification documents to support the development of sales propositions.



Dubber Corporation Ltd



- Report to James Slaney

Salary

Base: $180,000 per annum
OTE: $300,000 per annum
Accelerators: unlimited based on achievement.

Target and Commission structures will be determined annually

Benefits

- Medical & Dental Insurance: $1,500 monthly reimbursement (Note: aim for Dubber to arrange this directly)
- Cell phone cost reimbursement

MBO

Upon the successful achievement of the below during the first 3 months of engagement, $15,000 compensation will be earned. Additional sales achievements will be separate to this structure.

Begin direct communication with Key prospects:
- AT&T - New Jersey
- Cox - Atlanta
- MetaSwitch - Dallas
- CDK - Portland
- EvolveIP - Philadelphia
- Shaw Communications - Calgary Canada
- Note: Prospect list is much larger, but this is the key prospects.

Begin direct communication with Dubber partners:
- ECG - potential distribution/referral partner - Georgia
- Mark Bing - BroadSoft AM for AT&T
- Russell Sanders - BroadSoft (AVP MSO Sale) - Introducer to Cox
- Jean-Francois Pharand - Oxilio - Dubber Partner in Canada (focussed on Bell Canada)

Deals:
- Close 1 'deal' in first quarter.
  - Deal definition: A Service Provider or Partner who signs an agreement with Dubber, allowing  Dubber the ability to announce to our Investor market (note: The ability to announce is the requirement, not the release of the announcement.)
  - Agreement definition:

Dubber Corporation Ltd



- Service Provider signs a Master Service Agreement, with or without a financial commitment. E.g. EvolveIP agreeing to connect to Dubber and begin offering Dubber as a premium recording service.
- Service Provider signs a Channel Partner Agreement (or similar), limited to AT&T and Cox.
- Partnering or Resell Agreement with MetaSwitch, ECG or others as approved during the quarter.

## Commission

Commission calculation is based on the increase of recurring revenue within the region, with accelerators for new Service Providers Agreements. New Agreements value to Dubber are when they can be announced to the Australian Stock Market.

## Dubber ESOP

Joining Dubber enables you to become part of the Employee Share Option Program (ESOP). The ESOP allocates Dubber share options to members of the Dubber team on a yearly basis, as stipulated by the board of Dubber.

## Severance

Upon either of the below events occurring, Dubber will pay 1 year's Base Salary. Severance will only apply after the probation period has expired.

1. Dubber Corporation including its American subsidiary is sold, with the new owner not requiring the services of Todd Rowan post sale.
2. Dubber Corporation ceases to have localised staff or generally ceases to operate in the American market, meaning that Todd Rowan would not be required within Dubber post such event.

In all other circumstances, general terms of employment will apply in relation to Severance.

Dubber Corporation Ltd

Dubber Production 000003



**Additional Details**

Probation Period: 3 Months
Sick Days: 5
Vacation: 21 days per year
Public Holidays: 10

**Commencement**

The start date will be the 7th of April 2017.  The first 2 months, Todd Rowan will be contracted to Dubber, with the relationship to moving into a standard employment agreement following the second month. The start date will commence the Probation Period and accruement of Vacation and Sick Days.

**Acceptance**

Sign below to accept this offer.

Signature: _____

Name: Mr. Todd Rowan

Date: _4-5-2017_

Dubber Corporation Ltd

# BDM Commission Structure

|  | USD - $ |
| --- | --- |
| Per Single Point | 2500 |

|  | Points | Calculation |
| --- | --- | --- |
| Deal | 1.5 | per Service Provider or Approved deal |
| Committed Revenue | 0.15 | per $1250 USD committed monthly revenue. Starting at $1250 |
| Addressable Market | 0.1 | per 30,000 users and in 30,000 brackets. Starting at 30,000 |

## Conditions

### Deal

A Service Provider that has Investor market benefit for Dubber via an announcement.

Not all Service Providers will be announced, but can be approved as a Deal by Direct manager during sales process.

Deals can in some cases relate to an Enterprise client, if significant quantities of Users are included or a globally recognised brand.

Deals can include the establishment of significant Partnerships (must be approved during engagement), but in these cases Addressable Market will not apply and Committed Revenue will need management approval.

### Committed Revenue

On the date of singing, the amount of revenue contracted to Dubber.

This revenue must commence within 3 months from date of Go Live with Dubber.

### Addressable Market

Applies when a Service Provider has an existing User Base over the minimum User quota.

Users in this Addressable Market must be connected to the 'call control' platform which Dubber has the ability to record.

The Service Provider must include the Addressable Market amount of the Dubber order.

### Commision Timeline

When commission falls due, it will be paid 30 days from month end.

Trigger points for commission becoming due are below.

Deal:

   After Go Live

   or Deal Publically announced to Dubber investor market.

Committed Revenue:

   After commencement of billing

Addressable Market

   After Go Live

DEFENDANT'S EXHIBIT

PENGAD 800-631-6989

Dubber Production 000095

Dubber Production 000096

# SM Override on BDM Commission Structure

| | USD - $ |
|---|---|
| Per Single Point | 750 |

| | Points | Calculation |
|---|---|---|
| Deal | 1.5 | per Service Provider or Approved deal |
| Committed Revenue | 0.15 | per $1250 USD committed monthly revenue. Starting at $1250 |
| Addressable Market | 0.1 | per 30,000 users and in 30,000 brackets. Starting at 30,000 |

## Conditions

### Deal

A Service Provider that has Investor market benefit for Dubber via an announcement.

Not all Service Providers will be announced, but can be approved as a Deal by Direct manager during sales process.

Deals can in some cases relate to an Enterprise client, if significant quatities of Users are included or a globally recognised brand.

Deals can include the establishment of significant Partnerships (must be approved during engagement), but in these cases Addressable Market will not apply and Committed Revenue will need management approval.

### Committed Revenue

On the date of singing, the amount of revenue contracted to Dubber.

This revenue must commence within 3 months from date of Go Live with Dubber.

### Addressable Market

Applies when a Service Provider has an existing User Base over the minimum User quota.

Users in this Addressable Market must be connected to the 'call control' platform which Dubber has the ability to record.

The Service Provider must include the Addressable Market amount of the Dubber order.

### Commision Timeline

When commission falls due, it will be paid 30 days from month end.

Trigger points for commission becoming due are below.

Deal:

After Go Live

or Deal Publically announced to Dubber investor market.

Committed Revenue:

After commencement of billing

Addressable Market

After Go Live

26/11/2018                          Dubber Inc. Mail - FW: From Todd Rowan Response needed

 **dubber**

Eric Beylin <ericb@dubber.net>

## FW: From Todd Rowan Response needed
1 message

**todd@trowan.com** <todd@trowan.com>                          10 November 2018 at 02:04
To: james@dubber.net, ericb@dubber.net

To Dubber Leadership,

It has been one week since I sent my email below. I have not heard anything back from Dubber or its representatives. I expect to receive a response no later than 11/15/2018. If I do not hear back from you by way of a response by 11/15/2018, I will forward a copy of this email and escalate my issues through my attorney who specializes in employment claims here in Georgia. I look forward to your response.

Best Regards,

Todd Rowan

**From:** todd@trowan.com <todd@trowan.com>
**Sent:** Friday, November 2, 2018 5:14 PM
**To:** ericb@dubber.net
**Cc:** todd@trowan.com
**Subject:** From Todd Rowan

To Eric Beylin and Dubber Leadership,

I am writing in hopes of quickly receiving the monies I am owed following the abrupt and unprofessional termination from my job as the Sales VP for Dubber Inc. As you know, I was the first US employee and was recruited through Searchlogix via John Butler. Fortunately, there were specific commitments both verbally, written in email, and in my offer letter around my role and compensation at Dubber. These commitments led me to accept the Dubber Sales VP position because I fully relied in good faith on what I thought were truthful and concrete compensation promises made to me. Now it is time for me to formally assert claims which I have struggled to have Dubber honor during my entire career at Dubber. I will start with some background before addressing the specific areas of compensation that I am owed.

BACKGROUND FACTS

I was contacted by your recruiter and agent, John Butler at Searchlogix, in March 2017. Mr. Butler told me he was recruiting for a position for an Australian-based company, Dubber. The sales executive role would report to James Slaney and while the basic salary was low for me Mr. Butler and James Slaney persisted in telling me about a lucrative commission and ESOP package which would guarantee my earnings commensurate with my past compensation. I was informed that several large customers were "going live" in 2017 and based on my compensation package of revenue plus bonus for new service providers being signed up I could count on achieving a total On Target Earnings (OTE) of $300,000 USD. Dubber's representatives both overpromised and under-delivered on the scope of the role and the compensation that went with it. I was continually presented with the excuse that, "the company is not used to paying commissions". Every conversation around commission's calculations and timings of payment was continually met with resistance or no response at all. More importantly as things now stand and what

https://mail.google.com/mail/u/0?ik=5683f1027a&view=pt&search=all&permthid=thread-f%3A1616669156900313800%7Cmsg-f%3A1616669156...   1/3

DEFENDANT'S EXHIBIT 11 10-17-19 Rowan
FENGAD 800-631-6989

was most critical to me during the hiring process was the Dubber commitment that if I were ever terminated for any reason other than cause that I would be paid the equivalent of one-year's salary as my severance. It was part of my offer letter and documented in conversations I had with their agent SearchLogix   Also, throughout my employment period at Dubber, I was promised verbally and in writing commission payments that I were not paid when I was told they would be or in the amount that I was told they would be.

Ultimately, I was given an offer letter to sign that provides many benefits that I am now owed.  For example, the salary section promises a target earnings level of $300,000 which started with my salary of $180,000, and would reach that level through a combination of commissions, MBOs and an Employee Share Option Program(ESOP).  I will now cover these items to explain the several breach of promises that must be cured by Dubber now.

When I joined Dubber I was told my position was to replicate the build out of the Americas similar to what James Slaney and Nick Atkin did in the UK and European markets.  Along with my sales accomplishments, I also submitted operations budgets, compensation plans, headcount plans and revenue forecasting recommendations.  None of these were implemented with no feedback provided as to why.  The following is a small sample of publicly acknowledged achievements of Dubber during my employment.  It was acknowledged publicly to the market that Dubber has had tremendous success.  Below are some highlights from last fiscal year, back by what Steve calls "exponential growth" in the Americas.

- Revenue increase of 194% to $1.5 million AUS through June 2018, Americas run rate was zero when I started increasing to hundreds of thousands of dollars.
- User increase of 241%
- Global Foot print increase of 73% to 38 telecoms- Americas contribution of 15.

1. <u>Commissions</u>.  I have still not been paid commissions for the signing and billing of the following accounts submitted to Dubber at the end of September 2018; these are, Cincinnati Bell (CBTS), CDK Global, and Bell Canada.  Total owed is $25,956.66.  In a meeting in Portland with James I was told this would be paid in September 2018.  Second, I was underpaid commissions in June of 2018.  On February 15, 2018, in a 1-1 meeting with James I was told that my commission based on his calculations would be $28,474, plus an approx addition of $5,000 if we received a professional services payment from Cox.  I was informed that this would be paid end of February, it was not.  I was then told payment would be made by end of March, it was not.  I was asked if this was becoming a personal issue for me and I stated it was.  It was finally paid out, incorrectly, in June of 2018.  The total amount was approx. $20,000.  When I questioned the shortfall, I was told that Cox would now not be paid, despite assurances that it would but only on a 12-month amortized amount and Telehop (a Canadian service provider) would now not be paid since it was deemed not a Service Provider.  Telehop was included in our results as part of Dubbers "Expanding Global Footprint" in an announcement deemed to be Price Sensitive.  I am owed the shortfall of $11,000.  Lastly, in an email to James Slaney from me on April 4, 2017, I was told that I would receive 25% of the monthly increase in revenue produced in my region.  This payment would assure that I would achieve close to 100% of my promised commission amount.  It was never made, nor have I ever received a revenue report for my region despite numerous requests both in writing and verbally.  Based on my knowledge of the customer billings and the revenue collected from Cox, I estimate I am owed $78250 in unpaid commissions over the period of my employment.

2. <u>Severance Pay and Continuation of Heath Insurance Benefits.</u>  My offer letter contains severance pay provisions which I will not repeat here.  The bottom line is that I accepted my job with Dubber based on a specific commitment that I would receive a severance payment that equaled one-year of my $180,000 salary, along with health insurance benefits to cover me and my family.  The only condition given to me by SearchLogix was that I would not receive severance if I was terminated for misconduct or a gross disregard of my duties.  I knew that it would take time to find another job if I was suddenly terminated by Dubber--so the severance is critical to me and my family.

3. <u>ESOP Shares.</u>  This subject is again contained in my offer letter, and the specific commitment made by James Slaney was that I would receive ESOP Shares minimum at the end of the 2017 fiscal year or in the months following.  An ESOP was never implemented in Dubber for me despite a heated conversation with James that it would be by March 30, 2018 and a company-wide email from Steve McGovern CEO stating it would be done on Sept 25, 2018.  Like the specific promise of severance pay, I was promised ESOP Shares, and this was a core part of the reason I came to work for Dubber. I have earned these shares which I estimate to have a value of $32,000 USD.

Dubber Production 000023

4. <u>Expenses owed-</u> To date I have not received these.  I submitted an expense report on October 23 and will be sending a final report, shortly, for expenses incurred through October 26, 2018.  I would like these to be paid in a prompt manor.

CONCLUSION

I feel strongly about pursuing what is rightfully mine in terms of the past compensation and severance owed to me now.  Georgia law is favorable on forcing corporations who do not honor their commitments to pay them, along with attorney's fees and costs incurred in bringing claims like mine.  I would hope that a lawsuit will be unnecessary as a review of the compensation areas set forth above will put us on a path to reach an agreement to pay me the monies I am owed.  I look forward to hearing from you soon.


Best Regards,


Todd Rowan

Dubber Production 000024

## Re: From Todd Rowan  💬 Inbox ×

**Todd Rowan** <todd@trowan.com>
to me, todd ▾

Thanks for this Eric. Regarding the other outstanding items as I have said I want the response in writing by COB today or we need to move to

Thank you,

Todd C Rowan

+1 954 740 9467

On Nov 19, 2018, at 2:15 AM, Eric Beylin <ericb@dubber.net> wrote:

Hi Todd,

**Expenses:**
I have confirmed with John that the Oct Expenses were not processed due to an oversight by the payroll officer at ADP. This has since

**Health Care/COBRA:**
Please note that as Dubber Inc has less than 20 employees, we are not obligated to keep your Health Care active post employment, bu

I will continue the discussion with BlueCross over the coming days to clarify the COBRA position, and work out the best solution in rega

**Vacation Leave:**
The Vacation (PTO) policy is embedded within the Dubber Inc employee handbook. As Dubber Inc is still in its inception, the handbook
unused PTO in the case of termination.

<image.png>

I understand that as an employee and end user, your only visibility was the BambooHR portal, and on that basis and as **a sign of good**

Please see attached updated calculation workbook. I will Instruct John to process the balance payment with a view to have it paid in tim

**Other:**
In regards to Commission and other matters you have claimed are due, as James is overseas, I have not been in a position to discuss
still be beneficial for the two of you to have a meeting in person to discuss these matters. If you could advise a suitable time for you, I w

Cheers,

Eric



DEFENDANT'S EXHIBIT
12
10-17-19
PENGAD 800-631-6989

Tue, 20 Nov 2018, 02:41    ☆    ↩

the next steps which I would prefer to avoid.

been rectified and payment processed on 11/16.

it as **a sign of good faith**, we are willing to do so in the interim.

irds to keeping you on the policy until Jan 2019.

has been in draft format, which is why you hadn't seen it. See below for excerpt of the policy and note that it also notes that there are no payouts of

I **faith**, we are willing to honour the payout of unused PTO based on the initial HR portal policy, which is unlimited accrual.

ie for thanksgiving.

these matters with him in any detail as yet, and hope to do so over the coming days, however, as James is still in the US, and as such I feel it would ill see if James can lock that time in with you.

Dubber Production 000026