Appendix Exhibit 2
Declaration of James Slaney

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| TODD ROWAN, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>DUBBER, INC., )<br>)<br>Defendant. )<br>) | CIVIL ACTION NO:<br>1:19-CV-01276-SDG |

## DECLARATION OF JAMES SLANEY

1. My name is James Slaney and I am a resident of Melbourne Victoria, Australia. I am over the age of 18 and competent to testify to the matters set forth in this Declaration. Unless otherwise stated, the facts contained in this Declaration are within my personal knowledge.

2. I give this Declaration voluntarily and understand that it may be used for any purpose permitted by law.  If called upon to do so, I can testify in court as to the facts stated below.

3. I currently serve as President and Co-Founder of Dubber, Inc.

4. Dubber is a technology company that provides a scalable call recording service, which has been adopted as a core network infrastructure by multiple global telecommunications carriers in North America, Europe, and Asia.

5. Dubber was founded in Melbourne, Australia in 2011.

6. In 2017, Dubber began implementing a strategy to expand into the United States.

7. To achieve this goal, Dubber engaged with a U.S.-based search firm to identify potential candidates in the U.S. to work for Dubber and assist in bringing Dubber's products into the U.S. market

8. Dubber utilized a recruiter to locate a sales executive to develop U.S operations.

9. After the third-party recruiter identified Plaintiff Todd Rowan ("Plaintiff") as a potential candidate (among others), I began communicating directly with Plaintiff about his potential employment.

10. After numerous communications back and forth about the role and compensation, I provided Plaintiff with an Offer Letter – which he accepted. And Plaintiff began working for Dubber in April 2017.

11. Apart from the Offer Letter, Plaintiff never signed any other contract or agreement with Dubber pertaining to the terms, conditions, or compensation of his employment with Dubber.

12. Further, Dubber never offered Plaintiff any employment agreement or contract.

13. Plaintiff was an employee-at-will at all times.

14. Dubber did pay Plaintiff certain commissions. The amount of

commissions Plaintiff earned depended on whether, for a certain deal, Plaintiff was acting as an Account Manager or Sales Manager.

15. Plaintiff primarily performed the role of Account Manager, but sometimes also served as Sales Manager on various deals.

16. As an Account Manager, Plaintiff earned the following: For a deal announcement, Dubber paid Plaintiff $3,750.00 per deal announced to Dubber's investment market. For committed revenue, Dubber paid Plaintiff $375.00 per every $1,250.00 USD in committed monthly revenue (per deal) on the date of signing. For addressable market, Dubber paid Plaintiff $250.00 per every 30,000 users in the addressable market that were connected to the call control platform which Dubber has the ability to record.

17. As a Sales Manager, Plaintiff earned the following: For a deal announcement, Dubber paid Plaintiff $1,125.00 per deal announced to Dubber's investment market. For committed revenue, Dubber paid Plaintiff $1,125.00 per every $1,250.00 USD in committed monthly revenue (per deal) on the date of signing. For addressable market, Dubber paid Plaintiff $75.00 per every 30,000 users in the addressable market that were connected to the call control platform which Dubber has the ability to record.

18. Monthly, Dubber produced a commission report that laid out exactly what Plaintiff would earn in commissions, pursuant to the commission plan

discussed above.

19. In October 2018, Dubber determined that Plaintiff was not meeting the Company's expectations, as he failed to bring about the success that Dubber expected to achieve in the U.S. market.

20. As a result, Dubber terminated Plaintiff's employment on October 26, 2018.

21. In November 2018, Dubber reached out to Plaintiff to arrange a meeting between myself and Plaintiff to address his claim that Dubber owed him additional compensation following his termination.

22. Specifically, Eric Beylin requested that Plaintiff advise a suitable time for a meeting with Slaney to discuss final payment of commissions, as well as the other matters.

23. I agreed and understood that Plaintiff was owed his final commission check – in an amount Calculated by Dubber as $28,907.39.

24. I, and my team, remained baffled as to Plaintiff's contrived claims for additional commissions, in the form of a 25% "bonus", severance pay, and ESOP shares.

25. Nonetheless, we reached out to Plaintiff to arrange a meeting with the express intention to pay him the limited outstanding commissions.

26. Plaintiff outright refused to meet with me.

27. As of the date of this declaration, Dubber has not been sold.

28. Dubber's American operations remain in place and have never ceased to operate.

29. The ESOP program was never created during Plaintiff's employment. The ESOP program was eventually created, and certain Dubber employees were offered shares under this program.

30. At the time Dubber provided Plaintiff with the Offer Letter, Dubber fully intended to create an ESOP program – and did in fact create such a program, however it was not until after Plaintiff's termination.

31. At no time did I, or any other Dubber executive, manager, or agent, ever agree to pay Plaintiff 25% of the increased revenue in his region.

32. All commissions paid to Plaintiff during his employment were pursuant to our Commission Plan. A true and accurate copy of this plan is attached hereto as Exhibit A.

33. Plaintiff is owed his final commission check, amounting to $28,907.39, which did not become payable until after his termination.

34. At any time, Plaintiff is able to accept the $28,907.39 in unpaid commissions.

35. Dubber paid Plaintiff a salary of $180,000.00 per year plus commissions, pursuant to the commission plan, during his employment.

I declare under penalty of perjury that the foregoing is true and correct.



40726132.1

# Exhibit A

## BDM Commission Structure

| Per Single Point | USD - $ |
|---|---|
|  | 2500 |

|  | Points | Calculation |
|---|---|---|
| Deal | 1.5 | per Service Provider or Approved deal |
| Committed Revenue | 0.15 | per $1250 USD committed monthly revenue. Starting at $1250 |
| Addressable Market | 0.1 | per 30,000 users and in 30,000 brackets. Starting at 30,000 |

## Conditions

**Deal**

A Service Provider that has Investor market benefit for Dubber via an announcement.
Not all Service Providers will be announced, but can be approved as a Deal by Direct manager during sales process.
Deals can in some cases relate to an Enterprise client, if significant quatities of Users are included or a globally recognised brand.
Deals can include the establishment of significant Partnerships (must be approved during engagement), but in these cases Addressable Market will not apply and Committed Revenue will need management approval.

**Committed Revenue**

On the date of singing, the amount of revneue contracted to Dubber.
This revenue must commence within 3 months from date of Go Live with Dubber.

**Addressable Market**

Applies when a Service Provider has an existing User Base over the minimum User quota.
Users in this Addressable Market must be connected to the 'call control' platform which Dubber has the ability to record.
The Service Provider must include the Addressable Market amount of the Dubber order.

## Commision Timeline

When commission falls due, it will be paid 30 days from month end.
Trigger points for commission becoming due are below.

Deal:
   After Go Live
   or Deal Publically announced to Dubber investor market.
Committed Revenue:
   After commencement of billing
Addressable Market
   After Go Live

DEFENDANT'S EXHIBIT [signature] 10-17-19 PENGAD 800-631-6989

Dubber Production 000095

## SM Override on BDM Commission Structure

|  | USD - $ |
|---|---|
| Per Single Point | 750 |

|  | Points | Calculation |
|---|---|---|
| Deal | 1.5 | per Service Provider or Approved deal |
| Committed Revenue | 0.15 | per $1250 USD committed monthly revenue. Starting at $1250 |
| Addressable Market | 0.1 | per 30,000 users and in 30,000 brackets. Starting at 30,000 |

### Conditions

**Deal**

A Service Provider that has Investor market benefit for Dubber via an announcement.
Not all Service Providers will be announced, but can be approved as a Deal by Direct manager during sales process.
Deals can in some cases relate to an Enterprise client, if significant quatities of Users are included or a globally recognised brand.
Deals can include the establishment of significant Partnerships (must be approved during engagement), but in these cases Addressable Market will not apply and Committed Revenue will need management approval.

**Committed Revenue**

On the date of singing, the amount of revneue contracted to Dubber.
This revenue must commence within 3 months from date of Go Live with Dubber.

**Addressable Market**

Applies when a Service Provider has an existing User Base over the minimum User quota.
Users in this Addressable Market must be connected to the 'call control' platform which Dubber has the ability to record.
The Service Provider must include the Addressable Market amount of the Dubber order.

### Commision Timeline

When commission falls due, it will be paid 30 days from month end.
Trigger points for commission becoming due are below.
Deal:
  After Go Live
  or Deal Publically announced to Dubber investor market.
Committed Revenue:
  After commencement of billing
Addressable Market
  After Go Live

Dubber Production 000096